# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG ) | Case No. 3:19md2885 |
| PRODUCTS LIABILITY LITIGATION, ) | |
| ) | Pensacola, Florida |
| ) | March 13, 2024 |
| In re:  BRANDON CANUP ) | 10:06 a.m. |
| 8:20cv14021 ) | |
| ) | |
| _____ ) | |

STATUS CONFERENCE

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1–47)

A P P E A R A N C E S

FOR THE PLAINTIFF:      Law Office of David G. Gamble
                        By:  **DAVID G. GAMBLE**
                             *davidgamblelaw@gmail.com*
                        2805 Vermont Court
                        Arlington, Texas  76001

                        Aylstock, Witkin, Kreis & Overholtz, PLLC
                        By:  **BRYAN F. AYLSTOCK**
                             *baylstock@awkolaw.com*

                             **BOBBY J. BRADFORD**
                             *bbradford@awkolaw.com*
                        17 E Main Street, Suite 200
                        Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR*
*Certified Court Reporter*
*1702 E Baars Street * Pensacola, Florida  32503*
**DLBolandUSCR@gmail.com**

APPEARANCES: (cont'd)


FOR THE PLAINTIFF:      Mostyn Law
                        By: **MICHAEL A. BURNS**
                            *epefile@mostynlaw.com*
                        3810 W Alabama Street
                        Houston, Texas  77027

FOR THE DEFENDANT:      Moore, Hill & Westmoreland, PA
                        By:  **CHARLES F. BEALL, JR.**
                            *cbeall@mhw-law.com*
                        350 W Cedar Street, Suite 100
                        Pensacola, Florida  32502

<pre>
 1                       P R O C E E D I N G S
 2          **THE COURT:**  Good morning, Mr. Canup and Mr. Gamble, I
 3     believe.  It's nice to see you both, and I appreciate you
 4     coming this morning.
 5          I'm Judge Casey Rodgers.  I am the judge presiding
 6     over the 3M Combat Arms Earplug MDL.  I've been presiding over
 7     it for some time now, more specifically since April of 2019.
 8          Also in the courtroom today from plaintiff's
 9     leadership there's Mr. Bryan Aylstock, Mr. Brad Bradford, and
10     Mr. Mike Burns.
11          Good morning.
12          And then, from 3M, Mr. Charles Beall.
13          So, at the time that the parties entered into that
14     global settlement agreement, which was in August of 2023, it
15     was contemplated that the Court would schedule a conference --
16     this conference -- with every plaintiff who elected to opt out
17     of the settlement.  And there were a couple of reasons for
18     that.
19          First and foremost, I thought it would be important
20     and hopefully helpful given the sort of massive undertaking of
21     the MDL and enormous amount of time and energy, I'm sure you
22     can imagine, resources and money went into that litigation and
23     contributed to the global settlement.
24          You all -- neither one of you were here for that
25     litigation.
</pre>

1          Mr. Gamble, you actually came in very recently as

2     counsel for Mr. Canup.  Previously he had separate counsel

3     throughout his case, but his case was like hundreds of

4     thousands of others that never saw the inside of the courtroom,

5     for obvious reasons.

6          But, because of that, I felt it would be important to

7     meet with those who are going to continue forward with their

8     cases to have some understanding from me, from my perspective,

9     about the litigation and the extraordinary nature of the

10    litigation before you decide ultimately to go forward with your

11    case, although I know that's the decision you've made, and

12    that's fine.  We'll talk about that.

13          But I also felt -- along those lines, I also felt, as

14    a second reason for these conferences, that it's important for

15    me to afford all plaintiffs who have opted out -- and there are

16    not very many, frankly, which is quite extraordinary -- that

17    you all be afforded one final opportunity to participate in the

18    settlement, if you choose to do so, before the final settlement

19    registration deadline, which is March 25th.

20          And I felt it would be important for you to be here to

21    meet with me, be able to ask me questions, if you have any

22    questions.

23          Also, as you can see, leadership counsel from the

24    plaintiffs' side is here, if you have questions of them and/or

25    3M as well.

5

```
 1              And then there's also an opportunity following my
 2    remarks for you all to meet with the magistrate judge assigned
 3    to this litigation, Judge Hope Cannon, who is very, very
 4    familiar with the settlement.  She was an instrumental part of
 5    that settlement, and she knows the program very well, in case
 6    you have questions about the settlement program.
 7              From experience, I've seen where -- and this isn't --
 8    I'm not talking about you all specifically, but in other
 9    instances it may be that the plaintiff didn't have a full
10    understanding of the settlement program and how he or she might
11    fit within the various aspects of the program, including the
12    EIF aspect of the settlement program.  And there have been some
13    questions about that from other opt-out litigants.  So, again,
14    that will be an option for you, if you choose to take advantage
15    of it.
16              I realize that being here for you today is a big
17    commitment.  And again, I appreciate you making that
18    commitment, both of you.  I know you're not local.  99.9
19    percent of the plaintiffs in this litigation are not local.
20              But it's also a good opportunity for me just to let
21    you know, particularly if you had been pro se, Mr. Canup, which
22    you're not.  But some who are similarly situated to you in
23    terms of having opted out, they are pro se, meaning they're
24    representing themselves.  They don't have counsel.  They either
25    never had counsel or their counsel has withdrawn.
```

1          And so, it's a good time for me to make sure that

2     everyone understands that appearing in court -- believe it or

3     not, even though, you know, we're in this age of technology

4     where we can do things like Zoom very easily, appearing in

5     court is part of litigation.

6          With you having counsel means for you fortunately most

7     of the time your counsel can appear on your behalf other than

8     today.  But for a *pro se* litigant, those individuals need to

9     know that it's just part and parcel of litigating.  You have to

10    follow court orders.  And if the Court directs you to appear in

11    person in the courtroom, then you have to be here.

12         Mr. Gamble certainly knows that as an officer of the

13    Court.

14         So, I'm not going to twist your arm today.  You're not

15    here for that purpose in trying to get you to settle your case.

16         I do want you to have an opportunity to talk more

17    about that, if you'd like.  You're not required to.

18         We're here.  I mean, you've made the decision to opt

19    out of the program, and that's your right.  And you've made

20    that decision and, frankly, that's why we're here.

21         But it's not -- we're going to talk about this.  But

22    it's not as simple in just saying *I want to take my case to

23    trial, I want to fight, you know, I want a jury trial*.  It's

24    not that simple.

25         And Mr. Gamble, I'm sure, has had some discussions

1    with you about that; and if he hasn't yet, he will.  There is a

2    lot more to litigating a case than simply saying *I want to*

3    *litigate my case*.

4            And this litigation takes on a new meaning because

5    there are certain hurdles that you have to get over -- all

6    people or claimants who are situated like you, you have to get

7    over before you'll ever get to a jury trial.  So we'll talk

8    about those challenges.

9            But let me first, before I talk about the challenges,

10   just briefly discuss the settlement program and the litigation.

11           And from my perspective -- and, frankly, I don't know

12   of anyone who has a better perspective than I do to talk to you

13   about the settlement program and about the litigation.

14   Because, frankly, I'm the only neutral in the courtroom, and I

15   have been very closely associated with the litigation for the

16   nearly five years that I've had the MDL.

17           I'm very familiar with the claims, very familiar with

18   the defenses, very familiar, obviously, with the management of

19   the litigation throughout the four-and-a-half years or so prior

20   to the settlement, and I'm very, very familiar with the

21   settlement as well.

22           But the litigation, from my perspective, this

23   litigation in particular, has been extraordinary for several

24   different reasons, not the least of which is the fact that it's

25   the largest MDL in the history of the judiciary.

1         Never before -- not asbestos, not mesh, not BP

2    Deepwater Horizon -- none of those MDLs even come close to the

3    size of this MDL.  And for most of its life, this MDL has

4    occupied a third of the federal judiciary's entire civil

5    docket.

6         And so, it's extraordinary in that sense because not

7    only is it a big litigation for the parties to have to deal

8    with, but it's a huge undertaking for the judiciary.

9    Extraordinary.  And there's a lot of strain and toll that has

10    come with the litigation.  So it's been extraordinary in that

11    respect.

12         It was also extraordinary -- and these are things you

13    won't really know any firsthand knowledge about.  Maybe you've

14    heard about some of the things I'm going to mention to you.

15    But you weren't here, like I said, you weren't here on the

16    ground in the trenches for the litigation.

17         But one of the things right out of the gate that was

18    unique about the 3M litigation was the fact that so much of the

19    discovery, which, Mr. Canup, that means the factual

20    information, the data this is typically in the hands of either

21    the parties, sometimes it's in the hands of a third party, but

22    not to this magnitude.

23         And what I'm referring to is that most of the factual

24    data was in the hands of the Department of Defense and the

25    Department of Veterans Affairs or the Veterans Affairs

1  Administration.

2       And trying to convince those government agencies to
3  produce the amount of data that was necessary to be produced in
4  this litigation, given the number of plaintiffs, was difficult,
5  to say the least.

6       I traveled to the Pentagon with the parties on a
7  couple of different occasions to the Department of Justice.
8  There was a couple of years' worth of relationship building in
9  trying to get the data.  Because there's no question in my
10  mind, if we have to do this on an individual basis, claimant by
11  claimant or plaintiff by plaintiff, servicemember by
12  servicemember, without a centralized process for obtaining that
13  data, we would have been here for years and years and years.

14       I'm a veteran Army soldier.  And when I was first
15  assigned the MDL, I decided to -- because I knew this was going
16  to be an issue, I decided to apply to the National Archives for
17  my records from the '80s, and I still haven't gotten them.

18       So it's obvious that that would have been unrealistic
19  to think with that many plaintiffs -- at the time I'm talking
20  about we were probably 150,000 to 200,000.  Of course, it grew
21  from there.

22       The other thing that's extraordinary, a couple of
23  other things, in addition to the common, sort of, the military
24  discovery that was in addition to the corporate discovery that
25  was conducted here was some of the defenses in the litigation.

1    And one of those, notably, is the government contractor

2    defense.

3              Mr. Gamble is probably familiar with this.

4              Mr. Canup, you are probably familiar and understand

5    that, as a servicemember, you're precluded, just like I was

6    precluded, from suing the military based on a service-connected

7    or service-related injury.  It's called the Feres Doctrine.

8              Well, when you have a government contractor who builds

9    things for the government -- designs or builds for the

10   government and then people are injured as a result of that,

11   that contractor can raise what's called the government

12   contractor defense.

13             And if it's granted -- if that defense is accepted,

14   then that contractor moves into the shoes of the United States

15   military and is entitled to sovereign immunity like the

16   military from those claims.

17             And so, 3M raised that defense right off the bat in

18   the litigation, and I frontloaded that because I didn't know

19   what my ruling would be, I had no idea, but I knew it was a

20   potentially dispositive issue.

21             And what that means is, the issue was such that, if I

22   granted 3M the defense, if I said, yes, you're entitled to the

23   defense, the game is over, the case is over for everyone, there

24   is no live case.

25             So that was something that had to be dealt with, and

1    it was unique.  At the end of the day, I ruled in favor of the

2    plaintiffs and against 3M and actually granted judgment in

3    favor of the plaintiffs on the issue.

4         However, the issue was part of every appeal that was

5    taken -- I'm getting a little ahead of myself.  But you know

6    there were trials in this litigation, and every one of those

7    plaintiff verdicts was appealed by 3M.

8         The settlement was reached before those appeals had

9    been decided, although one was -- the first was very close to a

10   decision.  There had been oral argument and I suspect a

11   decision was imminent at the time of -- certainly at the time

12   of the settlement.

13        It's anybody's guess what the Eleventh Circuit, which

14   is the circuit that -- court of appeals that decides issues in

15   this geographic area from my court -- anybody's guess what the

16   court ultimately would have done with that.

17        They could have decided that I was entirely wrong and

18   granted 3M the defense, which would have meant game over for

19   everybody.  They may have decided that I was partially wrong or

20   incorrect, in that, there was a jury question on that issue,

21   which would have meant that those verdicts would have been

22   reversed, those cases would have come back from the appellate

23   court for retrial here, and that issue of the government

24   contractor defense would have been a jury question.  And then

25   the juries would have each decided -- the parties would have

1    litigated that issue in front of the jury, and the jury would

2    have made a decision on that defense.

3            But I guess the point of this is it is -- that was a

4    bit extraordinary.  But the other thing that's something you

5    should keep in mind, both of you, is this is still a live

6    issue.

7            As I said, it was never decided -- the issue was never

8    decided on appeal by the Eleventh Circuit.

9            And so, Mr. Canup, if you continue forward and you end

10   up at some point with a trial, if you prevail at that trial,

11   there is no doubt that 3M -- I'll let Mr. Beall speak to this

12   -- but 3M will appeal, and that issue is still a live issue on

13   appeal.  So they will argue it and the Eleventh Circuit will --

14   ultimately may have to decide it.

15           Also, I mentioned, again, the verdicts, so obviously

16   there were trials.  This was most certainly extraordinary as

17   part of this litigation or any litigation, frankly.

18           There were 16 bellwether trials.  Bellwether means we

19   selected the most representative sample of cases that we could

20   come up with, and they were truly -- in my mind it was a -- one

21   day, if you're interested, I can explain it to you.

22           But it was a very good process that we went through

23   statistically -- it was random at first and then there was a

24   statistical analysis applied called a prevalence analysis to

25   come up with a representative sample.

1          And we did that and ultimately there were 19

2     plaintiffs who went to trial over the course of 14 months in 16

3     different trials.  So two of the trials had consolidated

4     plaintiffs, so they had more than one case in a trial.  But

5     there were 19 verdicts in 14 months.

6          I presided personally over six of those trials.  I

7     covered for judges in two of the other trials.  And I observed

8     every single trial -- if I didn't preside over it, I observed

9     it live via Zoom.  And sometimes I had more than one Zoom going

10    at a time because we had trials that were overlapping

11    throughout the district.  Again, it was pretty extraordinary.

12         But I saw, as part of those trials, 13 plaintiffs

13    prevail, and I saw a devastated six plaintiffs lose entirely.

14    And then, from there, again, appeals in every one of those

15    cases.

16         The other thing that was extraordinary about the

17    litigation -- and again, this was done at random, too.  You may

18    be sitting there thinking, Mr. Canup, why was I on the

19    sidelines with -- you weren't alone, I promise you that.  There

20    were hundreds of thousands.

21         The bellwethers were pulled at random, as I said,

22    literally at random.  And then the wave cases, which I'm

23    getting ready to talk about, there were four waves.  We called

24    them waves because they were cases that were worked up for

25    discovery and they're called waves because they overlapped in

1   terms of their discovery periods.  But there were 500 per wave,

2   so roughly 2,000 cases in the beginning, and they were all

3   pulled at random.

4       So it's just the luck or not the luck, however you

5   want to look at it, whatever your perspective it, of the draw,

6   in terms of what claimant got into the courtroom versus

7   claimants who didn't.  There was nothing intentional about that

8   other than to have a random process and then a representative

9   process for the bellwethers.

10      One other unique aspect of this litigation that I'm

11  sure both of you are aware of, and I'll just touch on it

12  briefly, was the Aearo bankruptcy.  And that was -- "detour"

13  seems to be maybe an understatement.  But it certainly took

14  this litigation out of commission for a while.

15      Aearo was essentially a subsidiary of 3M.  They were

16  the company that 3M purchased in 2008 that actually designed

17  the plug.  And they filed a bankruptcy.  We're not going to get

18  into the specifics of that, but it was -- that direction that

19  the litigation was heading in at that point would have looked

20  very, very different in terms of an ending for the plaintiffs

21  than what happened here.

22      There are -- again, I don't want to get too technical,

23  but there are automatic stays that come into play when a

24  company files bankruptcy.  The company is always seeking a

25  channeling injunction that would prevent future litigation

1   against that company, they're always seeking third-party

2   releases.

3        There's a super majority rule where individuals, if

4   there's a plan that is confirmed and it is agreed to by a

5   certain number of the claimants in existence at the time, it

6   can be decided for other claimants who may not agree with the

7   plan that the plan is acceptable and those plaintiffs have to

8   live with that at least for the moment.

9        The Supreme Court is right now considering some of

10  these issues.  But, as it stands right now, state of the law,

11  that's how it works in bankruptcy.

12       It didn't happen here, but it can still happen.  I

13  guess the point is 3M never filed bankruptcy in this

14  litigation.  Aearo filed bankruptcy.

15       However, 3M, they can still file bankruptcy.  There's

16  nothing that precludes them from filing bankruptcy.  I don't

17  want them to file bankruptcy, but I can't preclude them from

18  filing bankruptcy.

19       Do I think it's going to happen?  No.

20       Do I know it's not going to happen?  No.

21       I don't know anything about, really, their business

22  model, what pressures they face.  I know what I read, just like

23  everybody else, what you read in the press about their business

24  model and spin-offs and things that they're doing and stocks

25  and dividends and those kind of things.  I don't know.  I mean,

1    I don't know.

2              I know they have other litigation hanging over their

3    head -- "they" meaning 3M -- that is substantial, and it's not

4    just this litigation.  It's the PFAS litigation that you may

5    have heard something about.  So that's another sort of

6    extraordinary aspect of this.

7              And then finally, the last point I'll make as far as

8    how extraordinary this litigation has been -- and this speaks

9    to, in my view, the fairness of the settlement, and I do

10   believe the program is fair under the circumstances, most of

11   what I've just discussed -- but the fact that there's nearly

12   100 percent participation by claimants.

13             So there were just over 300,000 plaintiffs who

14   appeared on a declaration form on September 12th of 2023 --

15   that was the reference date -- and then ultimately some were --

16   many were dismissed for different reasons, but ultimately just

17   over 250,000 claimants registered for the settlement -- or

18   registered for the program.

19             You had to register to -- you registered.  But then,

20   when you register, you decide are you opting in or are you

21   opting out.

22             And so, as far as registering and opting out, we have

23   under 20 cases, 20 plaintiffs who have chosen not to

24   participate in the settlement in favor of litigating.  Everyone

25   else has opted into the program.  That is extraordinary.  The

1   percentage is, I don't know, 99.99999, something like that.

2   It's very, very, very, very high in terms of participation

3   rate.

4          So let me speak just a minute, Mr. Canup and

5   Mr. Gamble, to how your case will proceed going forward.

6          For the reasons I just went over with you, the

7   magnitude of the litigation, the toll of it on not just the

8   parties but also on this Court but also on the judiciary as a

9   whole, it was my decision at the time of the settlement to

10  enter case management orders to effectuate the settlement

11  program but also to manage the litigation going forward.

12         And at that time, obviously, we had no idea -- I

13  certainly had no idea about how many plaintiffs would actually

14  opt in versus opt out.  I didn't know.

15         But given the toll that the litigation had taken

16  already and the advanced stage of it, you know, pushing five

17  years at that point, the amount of data points that the parties

18  had already gained through the bellwether process, I felt it

19  was important to put in place CMO 57, which is Case Management

20  Order No. 57, and require people going forward to comply with

21  the requirements of that order.

22         And some may say, *Well, Judge, I don't think that's*

23  *fair.  This isn't the type of order that you enter in a one-off*

24  *case or in your other civil cases on your docket.*

25         And I guess my response to that is there's nothing

1    ordinary about this litigation.

2              You may feel like, well, it is ordinary, it's unique

3    -- or it's unique, it's ordinary to me or it's unique to me,

4    and I shouldn't be lumped in with all these other people who

5    have made up this litigation.  But you are.  I mean, it is what

6    it is.  You are a part of this litigation.

7              And this Court has lived this litigation for nearly

8    five years, and I understand it.  I understand the complexities

9    of it.  I understand the science, which I'll talk to you about

10   in a minute.  I understand what juries have done and what they

11   can do, what they won't likely do with certain types of

12   evidence.

13             Again, there's a great deal of data that I have and

14   the parties have.  And so, people who are going to go forward

15   in the litigation, they'll have to meet these requirements in

16   order to do that because there's a lot at stake.

17             It's a lot to try these cases, and, if you go forward,

18   you will certainly figure that out.

19             So I'm not going to walk -- you have counsel.  And

20   even if you were *pro se*, I wouldn't walk you through every line

21   of CMO 57.  It's 39 pages.

22             I'm sure Mr. Gamble has familiarized himself with it.

23   He understands that you and he are both bound by it.

24             But just to highlight a few of the features, there are

25   30-day deadlines, and there's a number of different sort of

1    categories of production and things you're required to do.   And

2    those deadlines for you passed on February 20th.

3           There is a cure period in CMO 57.   And what that means

4    is it's a period where 3M will notify the plaintiff of anything

5    they perceive to be deficient as far as the production of

6    documents, and then there's a 30-day cure period following that

7    notification.

8           And then, following the cure period, if there are

9    still deficiencies, then there will be a show-cause order, and

10   the parties will come before the Court, and I'll resolve it.

11          You and Mr. Gamble may say there are no deficiencies.

12   Mr. Beall and his stable of lawyers may say, yes, there are

13   deficiencies.   And then I'll need to decide if there are.   And

14   if you have been noncompliant with the order, then I will take

15   that and I will rule.

16          There has been a deficiency letter issued to you.   It

17   was issued on the 8th.   And so the cure deadline for that would

18   be April 8th.   I think the 7th is a Sunday.   But there are a

19   number of deficiencies.   Mr. Beall can speak to this, if he

20   wishes.

21          There's also a requirement in CMO 57 that I don't

22   believe has been complied with, and it was for you to provide

23   an affidavit regarding the statute of limitations.

24          Given the age of the cases that were filed -- and

25   yours, I believe, might have been filed in 2020.   I could look

1    back and confirm that.  But given when the plug was last -- and

2    I know the answers to these questions.  You and your counsel

3    may not know.  But given the time frame where the earplug

4    ceased to be in existence in terms of being manufactured and

5    distributed, there's a good bit of time between that date and

6    the date that cases were filed.

7              I've made a number of different rulings on the statute

8    of limitations throughout the bellwethers.  But for purposes

9    here, you are required to submit that affidavit, and I don't

10   believe you've done that.

11             And so, frankly, Mr. Gamble, the case is subject to

12   dismissal on that basis alone if that hasn't been done.  I

13   don't know why it hasn't been done, but keep that in mind.

14             If you are allowed to submit that, if there's -- I

15   don't know that there's a cure period for the affidavit.  I'd

16   have to look back at CMO 57.

17             But to the extent you're not in violation yet of the

18   order or if you are in violation of it and I agree with you

19   that there's some sufficient reason for that and I allow you to

20   submit it out of time, one of the first things that will happen

21   in this litigation going forward is that I will set up an early

22   dispositive motion structure for statute of limitations.

23             And that will include a limited deposition, Mr. Canup,

24   of you by 3M strictly on the issue of statute of limitations,

25   not everything else to do with your case and your claims and

1    damages and all of that.  But on statute of limitations, that

2    will happen.

3            And then 3M will be given an opportunity -- you, too,

4    as well, either side -- to file a dispositive motion on the

5    issue of statute of limitations.  That will need to be

6    addressed before the case goes forward.

7            The other thing that CMO 57 imposes, I guess, as a

8    requirement is the need to disclose experts and expert reports.

9    And you have 60 days from the date you elected to litigate to

10   do that.  That deadline is March 18th.  That is subject to a

11   cure period, another 30-day cure period.

12           So, depending on 3M's notice to you of any deficiency

13   with regards to expert reports, your reports could be due as

14   early as April 18th.  Again, that depends on the notice from

15   3M.

16           But this expert deadline is a red line.  It is a

17   strict deadline.  You cannot move forward in your case without

18   an expert.  The litigation regarding -- well, the litigation,

19   as I've said, was complex.  But it was complex not just because

20   of the size of the litigation.  It was complex because of the

21   medical science and what was required as far as proof by the

22   plaintiffs to convince a jury, you know, that not only that the

23   plug was defective -- that's a big part of it -- but also that

24   that defect caused your specific injury.

25           And the medical science on hearing is complex.  I'll

1    say it's complex.  No plaintiff in any jurisdiction in this

2    country, whether it's here or some other jurisdiction in some

3    other district in federal court or state court, can get to

4    trial in one of these cases without a medical expert.  It won't

5    happen.

6         What we saw in the bellwether trials were multiple --

7    not just one expert, there were multiple experts.  There were

8    audiologists, there were ENT doctors, there was a subspecialty

9    of ENT of surgeons called neurotologists, there were acoustical

10   engineering experts, there were ballistics experts, there were

11   military contracting experts.

12        And I'm sure I'm leaving some out, but there were a

13   number of experts and not just on the defense side.  I mean,

14   these were on the plaintiffs' side and then they were met with

15   defense experts.

16        But for the bellwether plaintiffs, those experts cost

17   over $200,000 per case, and that did not include travel cost.

18   And I know this because I keep track of costs in the bellwether

19   litigation.

20        And so, in excess of $200,000 per plaintiff bellwether

21   case just for experts.  And those are the expert costs, not the

22   attorney time, but these were expert fees.

23        I saw, Mr. Gamble, in your disclosure -- there was a

24   26(a) disclosure that your expert witnesses will be disclosed

25   -- I'm quoting -- "by the deadline specified in the Court's

1    orders."

2         I just want to make sure you know and it's clear that

3    you have a court-imposed deadline for your experts.

4         **MR. GAMBLE:**  Yes, Your Honor.  And we do intend to

5    have both a medical expert and a vocational/damages expert

6    disclosed by that time.

7         **THE COURT:**  Okay, very good.  I just didn't want you

8    to think there was going to be some other order entered setting

9    a different deadline.

10         Okay.  So, Mr. Canup, as I said, I've served in the

11    military, and I can only imagine -- you know, no doubt, you've

12    suffered a great deal, you've sacrificed a great deal and I

13    have no doubt you've suffered a great deal.

14         And I suspect that you -- I don't know you personally,

15    but I suspect that you believe strongly that the CAEv2, the

16    earplug at issue in this case, is responsible for the suffering

17    you've endured.  And I sympathize with that.  And as I said, I

18    sat through many, many, many, many of these trials.

19         But something -- I would be remiss if I didn't say

20    this to you, having sat through all of the trials and seen what

21    it takes to get through a trial, is that it's not enough to

22    believe in the merits of your case.  I mean, it's just not.

23         Obviously, you have to prove -- you have to prove your

24    claims, again, no matter how strongly you believe in them.  And

25    everyone I've met in connection with this litigation, every

1    plaintiff I've met believes vehemently to their core in the

2    merits of their case.  And even your lawyer believes in the

3    merits of your case.

4           You still have to prove it on legal issues to me but

5    then from a factual standpoint ultimately to those people who

6    sit over there in the jury box.

7           And you've got to prove it to them based upon the law

8    and based upon the evidence.  And that evidence has to be

9    admissible, and it will have to show by a preponderance of the

10   evidence that the CAEv2 is defective.

11          And by the way, you don't get to use other jury

12   verdicts to do that.  Those jury verdicts are inadmissible.  So

13   no one will ever stand up in this courtroom or any other

14   courtroom and argue to your jury that they should find that the

15   CAEv2 is defective in your case because some other juries found

16   that in another case.  That will never be permissible in the

17   courtroom.  So you have to prove that yourself with your own

18   evidence.

19          And then, also, that the specific defect caused, as I

20   said just a moment ago, caused your specific injury and

21   damages.  And in your case, I don't believe you have a hearing

22   loss claim.  Your short form complaint references only

23   tinnitus.

24          If you had a hearing loss claim, you'd have to show

25   that you sustained a hearing loss at a certain decibel level

1  from noise exposure, and then, for tinnitus, that you sustained

2  a noise-induced injury causing your tinnitus while you were

3  wearing the Combat Arms Earplug and that you wouldn't have

4  otherwise suffered.

5        And that was the cases where 3M -- the trials where 3M

6  came away with a defense verdict were cases where the juries

7  just did not believe the plaintiff's injury had been caused

8  while the plaintiff was wearing the earplug.

9        So, in the military -- I know this and you know

10  this -- there is a lot of noise a lot of the time.  Noise is

11  everywhere in the military.  And again, I can say that as an

12  enlisted soldier.

13        Whether you're in the motor pool, whether you're on

14  the range, whether you're flying a helicopter, whether you're

15  fixing helicopters on a flight line, there's noise everywhere,

16  like I said.  Could be generators.  But you'll have to contend

17  with that.  And in every bellwether trial that had to be

18  contended with as well.

19        And it's not because these jurors in the six cases

20  that I'm talking didn't like the plaintiffs or didn't believe

21  the plaintiffs.  In fact, nothing could be further from the

22  truth or the case.

23        These plaintiffs in those six cases or six trials were

24  extraordinarily likeable.  I mean, they were personable.  They

25  were nice people.  They served our country.

 1           One in particular that comes to mind, a Mr. McCombs,

 2    had a story of incredible bravery.  He was in a forward

 3    operating base in Afghanistan and out on missions to find the

 4    bad guys.  Very compelling story from him.  And he had injury.

 5    He had both tinnitus as well as hearing loss.

 6           And if I recall, he had significant injuries.  But the

 7    jury could not find that he was able to prove that his injuries

 8    were suffered while wearing the plug and exposed to noise and

 9    not from some other exposure to noise.  And that was difficult.

10           Mr. McCombs's jury in particular, a couple of the

11    jurors had tears in their eyes.  They were very saddened that

12    they had to reach the decision that they did.  But under the

13    law, this jury followed the jury instructions and ruled against

14    Mr. McCombs.  Hard for them to do.

15           And there were others.  Like I said, Mr. McCombs

16    wasn't the only plaintiff who went to trial and lost their

17    case, but they lost everything.  It was over.  And no issues

18    really to appeal on the plaintiff's side.  So that was

19    difficult.

20           But I just, again, I know that folks have heard a lot

21    about the bellwether trials so there's been a lot reported

22    about them.  None of those reports are by people like me, a

23    judge who sat and listened to every single bit of evidence and

24    knew the law in every single one of those cases.

25           But there are reports of huge verdicts.  And there

1    were huge verdicts, but there were also goose egg verdicts, and

2    those people were devastated.

3          And it wasn't because their lawyers didn't do a

4    phenomenal job.  They did a phenomenal job trying those cases,

5    and they had some of the best experts -- Mr. Beall will tell

6    you that -- some of the best experts you could imagine on the

7    various issues that I've just discussed, but they still lost.

8    And it wasn't because they weren't injured.  They just couldn't

9    prove that causation.

10          So I understand -- Mr. Gamble said that you are going

11   to have your experts disclosed and the reports done in a timely

12   fashion, and that's good.

13          One of the things that I wanted to go over with you,

14   again, because you're here today for me to have a discussion

15   with you about -- and I feel like I would be remiss if I didn't

16   -- about some of the pitfalls of going forward.

17          I wouldn't want you or anyone else similarly situated

18   to you, Mr. Canup, to have your case dismissed or to have a

19   jury find in favor of 3M and tell you, like they did

20   Mr. McCombs and others, *We don't believe you've proven your*

21   *case*, without me having had this discussion with you.

22          It's expensive to go forward with what you're going to

23   take on.  And maybe you're independently wealthy and Mr. Gamble

24   has plenty of money to spend.  They will see to it that you

25   spend it, that I can assure you.

1          I would be remiss, I feel like, if I didn't have this

2   discussion with you.  And you're not the only one I'm talking

3   to like this.  I've talked to others, and there's more still to

4   go.  As I said, there's some 20 or so people who have opted

5   out.

6          But, in reviewing your specific DOEHRS data -- and

7   again, I don't believe you have a hearing loss claim.  Your

8   complaint is based on tinnitus.  And that's probably because

9   your audiograms are all within normal limits.

10         There was one -- and I don't want to get too in the

11  weeds, but these are things you should know to talk to your

12  expert about.  There was one 15 decibel shift at 4000 hertz,

13  and I think it was 2011.  But you're still at a 15 dB, so this

14  is still within normal limits.  I think you went from a 0 to

15  15, but you're still within normal limits.

16         And so, your audiograms are all within normal limits.

17  Maybe that's why there is no hearing loss claim in your case.

18  That would make sense.

19         But even with normal audiograms -- so, in a courtroom,

20  a normal audiogram is the sort of kiss of death for a hearing

21  loss claim.  But in the settlement program, there is an

22  opportunity or a possibility/opportunity for an EIF claim,

23  which is an extraordinary injury fund claim, even with someone

24  with normal audiograms.

25         And I will let you talk with, if you and your counsel

1    would like, with leadership more about this, or Judge Cannon,

2    if you like, but there's something called hidden hearing loss

3    that the settlement program has recognized as a category of

4    EIF.

5         So, with ordinary or normal audiograms, there's no

6    space for you in EPP or DPP with just hearing loss because you

7    have normal audiograms.  But there is a space in the EIF

8    possibly, again, for hidden hearing loss.  And that means those

9    are people who have normal audiograms but otherwise have injury

10   to their auditory pathway.  And so that can be discussed with

11   you as well.

12        But your tinnitus claim -- and I believe that is the

13   claim that you have -- and by the way, just for Mr. Gamble's

14   benefit, I don't believe -- and Mr. Aylstock can correct me if

15   I'm wrong -- I don't believe any of the bellwether cases were

16   tried based on tinnitus alone.  I don't believe we had a strict

17   tinnitus alone -- that that was the only claim.

18        I think there was a question about one of the

19   plaintiffs where the jury hung their hat.  But I think that the

20   case that was presented in all of them included tinnitus and

21   hearing loss.

22        Am I wrong or right?

23        **MR. AYLSTOCK:**  I think that's right, Judge.  There was

24   a dispute on one case about whether -- I think it was Mr.

25   Adkins -- had hearing loss or not, but we certainly presented

1    it.

2              **THE COURT:**  Right, it was presented that way, yeah.

3              **MR. AYLSTOCK:**  Yes, Judge.

4              **THE COURT:**  So I guess my point is there has not yet

5    been a test case that I'm aware of on just tinnitus alone.  I'm

6    not aware of.  That doesn't mean that there can't be.  I'm just

7    saying we don't have anything to point to as far as just that

8    type of case.

9              But regarding your tinnitus, Mr. Canup, there actually

10   is no -- there's no record or any indication of tinnitus in

11   DOEHRS data.

12             You do have a 10 percent VA rating service-connected

13   for tinnitus from 2013 at the same time the bilateral hearing

14   loss rating was denied, but the tinnitus was granted.  And that

15   service-connected rating would open a door for you with EPP as

16   far as the settlement program.

17             But with the courtroom, it's going -- it's difficult,

18   I mean, it's going to be more difficult to prove your tinnitus

19   than --

20             When you're in the settlement program, what the

21   settlement administrators look for is evidence to support your

22   claim.  They don't really look at evidence to contradict your

23   claim.  Do you have evidence to support it.  They're not really

24   interested in whether there's evidence to contradict it.

25             In the courtroom, quite the contrary, because that's

1    what these guys -- that's what they do.

2          And here, you have this tinnitus rating from 2013.

3    And there's a reference also, in addition to -- and I guess

4    this is what the VA sort of hung its hat on, there was a

5    reference to tinnitus in 2013.  But there were other references

6    in 2013 that indicate you don't have any difficulty hearing.

7          There's also -- and I think this is something to take

8    note of -- during the time frame that you say you wore the plug

9    -- the earplug and were injured was during your deployments in

10   2010 and 2011.  Those are the years you say you wore the

11   earplug.  But on your post-deployment assessments, both of

12   them, you report "no" to tinnitus.

13         So I'm not saying you can't prove your tinnitus claim.

14   If the jury just disregards these records and just believes you

15   from the witness stand, maybe so.  But again, that's a problem.

16   I can tell you that's a problem.

17         There also is something else that I think that you and

18   Mr. Gamble do need to be aware of because this was a feature in

19   some of the trials, but I don't know that I ever saw it to this

20   level or degree.  But there are references in your records to

21   you never wearing hearing protection devices during your

22   deployment.  And that's when your -- obviously, that's when you

23   claim your ears were damaged.

24         But if there were periods on your deployment where you

25   never wore hearing protection, that's going to be a problem for

1    you.

2            I don't know whether that's true or not.  And I'm not

3    here to make any credibility -- obviously, that's not why we're

4    here.  But I don't even know if you know this, that this is in

5    your records.  And maybe you and Mr. Gamble have a good

6    response for that.  You'll need one, because these guys don't

7    miss anything.

8            So I'm not telling you that you're not going to win

9    your case, if you get to trial, or that you're going to lose

10   your case.  I have no idea.  I just know that there's certainly

11   a possibility you will lose your case.  That's how it is with

12   any litigation.  No one knows what a jury will do.

13           And I know for some people I've talked to, you know,

14   they want their day in court.  They believe they've been

15   injured, they believe they've been injured by the earplug,

16   they've suffered greatly, and they want some vindication for

17   that.

18           And believe me, I understand that.  But I don't know,

19   if you asked Mr. McCombs or Angela Kelly or some of the others

20   who lost at trial, whether they felt any better or vindicated

21   at having a jury tell them, *We don't accept your case, we don't*

22   *accept your claim, you haven't proven your case*.  Even though

23   you're injured, even though you're hurt, you've suffered, you

24   didn't prove your case, and so case over.

25           Now, you may be one of the ones that walks out of here

1    with lots of money.  That's also a possibility.  I just want

2    you and Mr. Gamble to know getting there, even if you do win,

3    is going to take a lot, and then these folks will appeal.

4           Mr. Beall can speak to that.  They appealed every

5    verdict before.  So there won't be any money until -- no matter

6    how big the verdict is -- until the Eleventh Circuit rules on

7    the issues raised on appeal.

8           So my purpose today was just to meet with you, to

9    explain to you what this is going to be like going forward, and

10   to give you an opportunity, as I said, to speak with me.  If

11   you have questions, if there's something that I can address for

12   you, I'm happy to do that, if I'm able to.

13          You have a lawyer, so I certainly -- even if you

14   didn't have a lawyer, I wouldn't try to give you any legal

15   advice.  I'm just giving you my perspective as the judge who

16   has been presiding over this litigation for a long time and has

17   a great deal of familiarity with it so you go forward with your

18   eyes wide open.

19          And then if you'd like an opportunity, you or

20   Mr. Gamble, to talk with leadership counsel about some of what

21   I've said about the settlement program, some of the more

22   nuanced aspects of the settlement program, that's going to be

23   available to you as an opportunity, if you'd like, and then

24   also Judge Cannon, who is available to speak with you as well

25   and answer any questions.

1        And then, at the end of the day, if you leave here,

2   you know, you're leaving without settling, you're leaving here

3   having heard from me, you know, I feel better about that.

4   You've had an opportunity to ask questions.  And then, if you

5   decide to roll the dice, again, that's your case.

6        That's what our system is about.  The courtroom is

7   here.  We try cases.  And if it's not here, your case will be

8   tried in a different jurisdiction.  I certainly cannot tell you

9   when that will happen, though.

10        Okay.  So let me ask, Mr. Aylstock, if you have

11   anything you all want to add, and then Mr. Beall, and then I'll

12   give Mr. Gamble and Mr. Canup an opportunity if they have any

13   questions of me.

14        **MR. AYLSTOCK:**  Thank you, Your Honor.

15        Mr. Gamble and Mr. Canup, first of all, thank you for

16   your service.  I'm the court-appointed lead counsel.  Judge

17   Rodgers gave me the honor and responsibility to lead from the

18   plaintiffs' perspective.

19        I'll give you a little bit of my take because it might

20   be helpful to you in understanding how we got to where we are.

21        When this case started, it was sent to Pensacola.  And

22   we didn't -- had no idea how big it was going to be.  I think I

23   was in chambers with Judge Rodgers and defense counsel, and we

24   estimated maybe there would be 30- or 40,000 cases, maybe up to

25   50,000.

1          And it became, as Judge Rodgers said, the largest MDL

2     in history at the time, over 300,000 soldiers and veterans and

3     some contractors as well were in litigation with individual

4     lawsuits.

5          And that presented a lot of challenges to us as

6     plaintiffs' leadership in trying the cases.  It presented a lot

7     of challenges, frankly, to 3M, because they don't -- you know,

8     they're a large company, but they're not -- they don't print

9     money like the United States Government does.

10         But when we got into this case, we knew our first

11    hurdle was going to be this government contractor defense that

12    the judge indicated.  In fact, there were memos written I can

13    show you from so-called experts on our side saying this case is

14    a loser because the government contractor defense gives 3M and

15    its subsidiary Aearo immunity.

16         And we worked very hard to convince Judge Rodgers that

17    that's not the case, but that issue is still alive.  In fact,

18    although we tried all of those cases, my partner Brad, my late

19    partner Neil and I and others, we probably tried half the cases

20    and we were involved in every single one.  Mr. Burns was here

21    as well and can attest to that.  But everything about this

22    litigation was hard fought.

23         When it came to the trials, there were no offers

24    provided.  We knew we were going to the mat and going to the

25    Eleventh Circuit on that issue, and so we won some and we lost

1    some.

2            Mr. McCombs, we tried that case, and it was tough on

3    all of us but especially on him to lose it.

4            But as we progressed and we got over 300,000

5    claimants, we realized something has to be done, not just -- I

6    mean, obviously, the court system doesn't have the judges, the

7    juries -- nobody would have gotten relief except a select few

8    in our lifetimes because of the timing of it.

9            We also realized when it came time to pay, there's a

10   limit to what even 3M could pay.  And Aearo is the company that

11   developed the drug [sic].  It's a little, tiny company out of

12   Indiana and that's who went into bankruptcy and delayed our

13   resolution for a year.

14           But there's nothing that prevents them, even Aearo,

15   from doing that again, nor 3M, not that we think that they will

16   because we do have the settlement.

17           But when it came time to negotiate the settlement, we

18   had to take that into account.  Because, had the bankruptcy

19   worked -- and I can assure you they thought it was going to

20   work and we fought very hard against it because the amount of

21   money that was being offered to everybody -- and it would have

22   been open to everybody who filed a lawsuit or not.  Every

23   soldier, every veteran who said they used the earplugs, it

24   could have been half a million people.  And the amount of money

25   that was being offered in the bankruptcy was under a billion

1    dollars, so we're talking under $2,000 a case potentially.

2              And the bad thing about a bankruptcy, from my

3    perspective as a trial lawyer who has tried a bunch of cases in

4    this courtroom, is it doesn't give anybody a real choice.

5    You're stuck.  If the majority want to confirm the plan or the

6    super majority, it doesn't give our veterans and active duty

7    people a choice.

8              So we fought very hard for the better part of a year

9    and ultimately won that issue.  And that got us, frankly, back

10   to the settlement table, and we were able to get more than six

11   times the amount of money for just the people who had filed

12   lawsuits or were represented at the time.

13             So the settlement, as a practical matter -- we knew

14   what the net worth of 3M is, and it's different for market cap.

15   Net worth is assets and liabilities.  So about 12-and-a-half, I

16   think, was one of the stipulations, and we were able to get

17   about half of that from them.  And that's despite the other

18   challenges 3M faced that are completely unrelated to this,

19   including the forever chemicals and there was another

20   settlement for that.

21             And so I feel very proud of the settlement.  Just so

22   you know, I know that we didn't leave anything on the table.

23   In fact, we knew that they didn't have the cash, and we even

24   got them to give us some stock that's now back into cash.

25             But when it comes time to think about whether the

1    settlement is a good thing, I just want you to know, as lead

2    counsel and a guy who was in the room negotiating it with Brad

3    and others, that we feel that we did the absolute best for you

4    and all the other 250,000 people who decided to participate in

5    the settlement.

6         The other thing -- and we can go over this if you're

7    at all interested -- we tried to do it in a very objective way

8    with regard to looking at the audiograms.

9         We had the benefit, because Judge Rodgers and some of

10   us traveled to the Pentagon to get this information from the

11   DoD, of your audiograms and everybody's audiograms that was

12   housed at the DoD.  And that was an enormous effort in and of

13   itself.  But we were able, because of that, to design a system

14   that is very objective.

15        We look at, okay, what's your military service, how

16   did you get in, when did you get out for your hearing loss, and

17   then, of course, the tinnitus is the other component of it.

18        So there are potential issues or potential ways to get

19   into the extraordinary injury fund for various things.  Judge

20   Rodgers mentioned that.  Happy to discuss that with you as

21   well.

22        Because not every tinnitus case is the same.  Some are

23   somewhat bothersome, others it's a heck of a lot worse.  And

24   there's lots of treatment and we can talk about that.

25        So I guess that's sort of my perspective as lead

1    counsel about the settlement, the process.  But everything

2    about this case was hard fought.

3          There was a lot of, a lot of hours spent.  And

4    Mr. Beall and the firms associated with 3M have armies of

5    lawyers, and we fought them back as best we could and got as

6    much as we could for you and everybody else.

7          **THE COURT:**  All right.  Thank you.  And I can attest

8    to what Mr. Aylstock just said about how hard fought the

9    litigation was.  And I'll turn it over to Mr. Beall in just a

10   minute.

11         But I've never seen any litigation -- I've been on the

12   bench over 20 years.  I've never seen anything fought as hard

13   as this was fought.  And the stakes were high, no question.

14   But from, I mean, every turn, you know, 3M was right there, and

15   they were not rolling over, just not rolling over.

16         And I think Mr. Beall maybe will talk further about

17   that.  Because sometimes I worry that some of these -- maybe

18   not you, Mr. Canup, so I don't want to throw you in this pot.

19   But some of these opt-out plaintiffs, they've heard about big

20   jury verdicts, they're not thinking about the plaintiffs who

21   lost their jury trials, they hear about these big verdicts, and

22   they think, well, even if I don't get it to a jury, at some

23   point 3M will just settle with me outside of the settlement

24   program.

25         I cannot speak directly for 3M.  Mr. Beall can do

1    that.  But I can tell you from my perspective that will never

2    happen.  That will never, ever happen.  They will take you to

3    trial or you will take them to trial, and they will fight you

4    every step of the way getting there, they will fight you all

5    the way through that trial, and then they will fight after that

6    trial.  You may go to bankruptcy in the meantime, depending on

7    how big your verdict is, if you went.  And then they'll appeal.

8            And my belief -- and again, I don't -- I can't say

9    this based on anything I've heard from 3M directly to me.  But

10   based on my experience with this company, they will pay a

11   verdict before they will settle a case at this juncture.  After

12   everything that's happened, that's my belief.

13           But, Mr. Beall, why don't you speak for your client

14   instead of me speaking for your client.

15           **MR. BEALL:**  Thank you, Your Honor.

16           Thank you, Mr. Aylstock.

17           And it's a pleasure to meet you, Mr. Gamble and

18   Mr. Canup.  We met just a second ago.

19           My name is Charles Beall.  I work for a firm called

20   Moore, Hill & Westmoreland here in Pensacola.  But I'm one of

21   the many, many lawyers who are representing 3M in this case.

22           And we do want to thank you for your service.  We

23   understand that, and we do feel bad for the tinnitus that you

24   say you have.  And we understand that's not something that's

25   fun or enjoyable by any stretch.  We don't want to belittle

1    that as all.

2            I know you all feel very strongly about your case,

3    like the people that Mr. Aylstock represented at trial.  But I

4    do think it's important to know that 3M feels every bit as

5    strongly on the other side, and not just about whether you can

6    prove the causation issue.  But, to this day, we do not believe

7    this plug was defective at all.  And at every trial we've had,

8    we've brought in experts to test that, to discuss that.

9            We have government documents where the government

10   itself tested the earplug and found it to be effective.  So,

11   you know, we are going to test that issue the entire time.

12           We settled this case for business reasons.  Because,

13   as Mr. Aylstock pointed out, this is the kind of thing that,

14   you know, you just can't try 300,000 cases over the course of

15   lifetimes and everything.  So we made a business decision to

16   settle this case and put a lot of money in the settlement for

17   that reason.

18           And we did it on a structure that's going to allow for

19   independent medical review of all the claims remaining in

20   litigation.

21           Judge Rodgers has already talked about your DOEHRS

22   data, which she has access to, and we have experts who are

23   looking at these things.  So that's part of what we're doing is

24   making sure that we're getting independent people who are not

25   just people that we pay or that they pay who are looking at

1    this and seeing are these cases worth proceeding on.

2            And that structure is supported by the leadership, who

3    settled -- negotiated the settlement, by the hundreds of other

4    plaintiffs' lawyers who have agreed to the settlement, and by

5    the Court itself.

6            We respect that some people may decide to not take the

7    settlement and to litigate.  If so, we're going to, obviously,

8    stick firmly to the requirements the Court has set, we're going

9    to ask the Court to enforce, and I know the Court will enforce

10   the requirements of the Case Management Order 57 you've heard a

11   lot about today and other things.

12           We are, as Judge Rodgers noted, prepared to try these

13   cases.  We have a host of experts lined up that we could

14   probably try this case in a matter of weeks, if we had to do

15   it, because we have all the experts ready.

16           We tried 16 cases.  I don't think that I've ever heard

17   of an MDL where 16 cases were tried before.  I was at 12 of

18   them myself.  I believe the shortest trial was two weeks.  We

19   might have had a trial that ended in nine days, but that would

20   be the exception.  These were basically two-weeks-at-a-time

21   trials.  So it's a long, expensive process, and that's what

22   we're used to doing.

23           We will appeal if we lose.  We will appeal the

24   government contractor issue.  We will appeal evidentiary

25   rulings that we think are against us.  Obviously, it's got to

1    be an issue we think we can win on appeal, but we feel strongly

2    about that.  And I'm sure you will feel strongly the other side

3    of our appeals.

4              For the first set of appeals and I suspect for the

5    future appeals, the attorney we hired to handle this was the

6    leading United States Supreme Court lawyer in the country.  I

7    mean, he's the guy that's probably argued the single most cases

8    -- I think over a hundred now -- before the U.S. Supreme Court.

9    So, you know, we're going to spend the money to bring the best

10   people here that we can do.

11             As Judge Rodgers pointed out, there were six

12   plaintiffs who went to trial and lost.  There were, I believe,

13   several of them -- more than half of the trials ended up with a

14   plaintiff verdict.  But there were also a number of cases that

15   were in the bellwether process that were going to be tried

16   where the plaintiffs dismissed their cases before they even got

17   to a jury.

18             For one reason or another, they thought -- I don't

19   know the full reason.  I think some of them realized they just

20   can't win or they didn't want to deal with the stress or

21   whatever.

22             So, of the 27 bellwether cases that were set, 14 of

23   them resulted in no recovery at all.  So that's over half.  So

24   you can't just look at the ones that were tried.

25             And those cases were done before the requirements that

1    Judge Rodgers has talked about earlier were put into place.  So

2    you have a much harder battle than the people that were there

3    before for that very reason.

4         And I know there is a mediation process in the CMO

5    that we have to go to mediation, which we're willing to do.

6    But just as Judge Rodgers pointed out, we don't view the

7    mediation process as a chance for us to sweeten the pot.  We

8    view it as a requirement that we're going to go through in good

9    faith and talk about the reasons why we believe you should

10   accept the settlement.

11        But if you think it's going to be sort of let's hold

12   out and then we'll sort of throw more money on the table, it's

13   not my money, but I can assure you that would be the first time

14   that's happened in this litigation, and I don't expect it to

15   happen now.

16        Again, you have the right to make these decisions.

17   And I'm not going to -- obviously, I'm on the other side, so I

18   have an interest in this myself.  But we just want you to be

19   aware where we're coming from as you proceed forward.

20        And I do appreciate you coming down here.  And again,

21   thank you for your service.

22             **THE COURT:**  All right.  Thank you, Mr. Beall.

23             So, Mr. Canup or Mr. Gamble, any questions?

24             And, of course, you have counsel, Mr. Canup.  You

25   don't have to speak.  But I want to give you the opportunity,

1    if there are any questions from either one of you.

2            **MR. GAMBLE:**  Yes.  Thank you, Your Honor.  And I'll

3    just be real brief.

4            I understand you have a job to do, and you've done a

5    fine job, and these gentlemen over here have done a fine job.

6    But we do believe in the strength of our case and that, for

7    what he's going to have to deal with the rest of his life and

8    that he's dealing with, $10,000 just isn't going to come near

9    to cut it.

10           But I understand you've got your job to do and you've

11   got -- 3M has got the big pockets.  These two veterans are not

12   going to bankrupt 3M, though.  We're not worried about that.

13   That would be quite amazing if we could, but I don't think that

14   part is an issue.

15           And then going to the procedural stuff, Your Honor, we

16   worked our way through order No. 57, and we have recently got

17   this letter that he gave me today, and we will go through this

18   and try to cure everything that is possible.

19           **THE COURT:**  Okay.

20           **MR. GAMBLE:**  And if there's something -- if it turns

21   out there's one or two things that we think we've done and he

22   doesn't, then I guess maybe that's where the Court would come

23   into play.

24           **THE COURT:**  Yes.

25           **MR. GAMBLE:**  There was one thing that I was slightly

1    disturbed about.  The affidavit regarding statute of

2    limitations, I may have missed that in order 57.  I'm kind of

3    Johnny-come-lately to all this.

4             **THE COURT:**  I understand.  But there is a requirement

5    in CMO 57, and it does apply to Mr. Canup.  And so you'll find

6    it in the order, but it's a statute of limitations affidavit.

7             **MR. GAMBLE:**  Okay.  And I believe Your Honor said, you

8    know, "if the Court were to allow it."  This is not a motion

9    hearing, but to the extent -- if this is proper, I would

10   respectfully request and move to be allowed to supplement that

11   within seven days to get this affidavit in.

12            **THE COURT:**  Okay, I'll let you do that.

13            **MR. GAMBLE:**  Thank you, Your Honor.

14            **THE COURT:**  I'll give you permission to do that.

15            **MR. GAMBLE:**  I think that's all we have, Your Honor.

16            **THE COURT:**  All right.  One other thing I did not

17   reference -- and again, I'm not trying to pile on.  I know it

18   probably feels like that.

19            But again, in terms of me making sure that I've

20   covered everything I wanted to cover, the last thing I'll add

21   is -- we've talked about 300,000 cases -- and these were all

22   cases.  These aren't people parked out somewhere, you know, in

23   some software litigation platform.  These were filed cases.

24            I have dismissed -- and again, this is not directly to

25   your case, but just in general about the litigation and the

1    claims and lawyers' review of those claims and the merits of

2    them and then also a lawyer's ability to comply with deadlines,

3    there have been well over 100,000 cases dismissed with

4    prejudice.

5            So I guess the point, Mr. Gamble, is, I'm very serious

6    about the deadlines, and largely because I've been so serious

7    about the deadlines with others.

8            You know, I'm a judge looking at having dismissed over

9    100,000 cases for noncompliance.  I'm not going to start making

10   exceptions now.  So just keep that in mind.

11           All right.  Judge Cannon actually walked in -- hello,

12   Judge Cannon -- to the courtroom a few minutes ago.

13           I encourage you to at least speak to her for a few

14   minutes and see if she can add anything to the equation for

15   you.  If not, then we'll just monitor your compliance with CMO

16   57, and we'll move on according to a schedule.

17           All right.  It was very nice to meet you both.  Thank

18   you for coming.

19                  *(Proceedings concluded at 11:16 a.m.)*

20                  --------------------

21   *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter.  Any*
22   *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*

23

24
         *s/Donna L. Boland*                    *10-16-2024*
25       *Donna L. Boland, RPR, FCRR*           *Date*
         *Certified Court Reporter*