EXHIBIT

2

## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

CHRISTOPHER GRAVES,

             Plaintiff,                      Case No. 19-CV-3094

v.

                                       **NOTICE OF REMOVAL**

3M COMPANY and
AEARO TECHNOLOGIES LLC,

             Defendants.

---

Defendant 3M Company ("3M") hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1441, 1442(a)(1), and 1446, to the United States District Court for the District of Minnesota. As grounds for removal, 3M states as follows:

Plaintiff Christopher Graves seeks to hold Defendants 3M and Aearo Technologies LLC[1] liable for his tinnitus and hearing loss. (Compl. ¶ 13.) He contends that Combat Arms™ Earplugs, Version 2 ("CAEv2") manufactured and sold by Aearo were defectively designed and failed to provide adequate hearing protection. 3M denies these allegations. CAEv2, designed by Aearo in close collaboration with the U.S. military, represented a revolutionary breakthrough in hearing protection for service members. CAEv2 helped soldiers better maintain situational awareness (e.g., to hear nearby voice commands) while also maintaining some protection from gunfire and other higher decibel sounds. CAEv2

---

[1] 3M acquired Aearo Technologies, Inc. ("Aearo") in 2008. After acquiring Aearo in 2008, 3M continued to sell CAEv2. Aearo Technologies LLC, named in the Complaint, is a different entity from Aearo. Nonetheless, it consents to this removal.

met the U.S. military's specifications and helped the military provide hearing protection to service members.

In this action, 3M intends to assert the federal government contractor defense. Even though Plaintiff alleges that his employer acquired the CAEv2 commercially, and that used the CAEv2 for a non-military purpose, the government contractor defense still applies. *See, e.g.*, *Stallings v. Georgia-Pac. Corp.*, 2013 WL 1563231, at *3 (W.D. Ky. Apr. 12, 2013) ("Plaintiffs further argue that GE manufactured the turbines for military and public consumption, thereby destroying Defendants' argument that the military had extensive control over GE and Crane. . . . Even if Plaintiffs prove that GE sold these exact turbines to non-governmental entities, this does not undermine Defendants' demonstration, for the purpose of removal, that the Navy possessed extensive control over the design and manufacture of these turbines such that GE's production thereof was effectively acting under a federal agency.").

The CAEv2 was designed at the request of and in consultation with the U.S military to meet the military's rigorous specifications. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is therefore entitled to remove this action to have its federal defenses adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008) (*citing Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 (2007)).

Removal is timely because this action was served on 3M on December 3, 2019. Venue is proper pursuant to 28 U.S.C. §§ 112(a) and 1441(a) because the Fourth Judicial District is located within this District. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff and a copy is being filed with the Clerk of the Fourth Judicial District.

## **BACKGROUND**

The CAEv2 is an earplug with two insertable ends developed specifically for the needs of the U.S. military for use as hearing protection in noisy environments. CAEv2 has a yellow end and green end. Each end has a different purpose. When the yellow end of the earplug is inserted, users can still hear nearby low-level sounds, like verbal communication, but receive protection from high-level impulse noise, like gunfire. In contrast, when the green end of the earplug is inserted, CAEv2 acts like a traditional earplug, providing steady and continuous protection from both ambient and impulse noise.

In the area of national defense, the U.S. military relies on close collaboration with private contractors to design and develop products, such as the CAEv2, and manufacture and supply those products in accordance with highly particular specifications balancing the multitude of operational and budgetary needs of equipping the nation's fighting forces. This litigation involves a classic example of that military-contractor collaboration.

CAEv2 was designed at the request of and in consultation with military audiologists, including Dr. Doug Ohlin. Ohlin at the time served in the capacity of Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventive Medicine (USACHPPM). Ohlin and his program gave direction to Aearo to ensure that the CAEv2

3

would appropriately balance performance with military operational needs for soldiers and Marines. For example, Ohlin proposed the inclusion of the filter that was a key updated feature of the CAEv2. Ohlin specifically directed Aearo to ensure that the CAEv2 would fit into a military-issued carrying case. Ohlin also was involved in Aearo's testing of the CAEv2.[2]

Following the development of the product, Ohlin was involved in the ultimate approval of CAEv2 for military use and proposed purchasing CAEv2 to the Joint Readiness Clinical Advisory Board. The military's specifications for the CAEv2 reflect the design direction that Ohlin and his program gave to Aearo. In particular, these specifications are memorialized in a Medical Procurement Item Description (MPID) that was used by the Defense Logistics Agency (the U.S. military's purchasing authority), in soliciting bids from Aearo for the CAEv2. The MPID specified "military unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments," that should "be designed to provide protection from the unique noises created by military firearms, while allowing the wearer to clearly hear normal speech . . . such as voice commands, on the battlefield" and should be "camouflage green or another suitable dark color."

In sum, the CAEv2 was launched at the request of, and in close coordination with, the U.S. military. The CAEv2's design reflects the direction and feedback of individuals

---

[2] Ohlin's involvement continued following the military's decision to purchase and deploy the CAEv2. He provided Aearo with feedback from military personnel as to using the CAEv2 and developed training and instructions for military personnel.

acting on behalf of the U.S. military. The U.S. military purchased the CAEv2 and issued it servicemembers precisely because the CAEv2 fulfill the military's specifications and accomplishes the military's goal of balancing hearing protection with operational needs.

## BASES FOR FEDERAL JURISDICTION AND REMOVAL

## I. REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE.

Removal is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal rights under this section are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because Section 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, No. 11 Civ. 5990 (BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of s 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

The removing defendant must establish that: (1) the defendant is a "person" under the statute; (2) the defendant was "acting under" the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) the defendant was acting "under color of" federal office at the time of the allegedly tortious conduct; and (4) the defendant raises a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-

35 (1989); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012). All requirements for removal under § 1442(a)(1) are satisfied here. *Cf., e.g.*, *Ayo v. 3M Co.*, No. 18-CV-0373 (JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in case where product liability was sought for defendants' product's conformance with military specifications).

### A. The "Person" Requirement Is Satisfied.

The first requirement for removal under Section 1442 is satisfied because 3M is a "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *Isaacson*, 517 F.3d at 135-36 (holding non-natural person to be a "person" under § 1442).

### B. The "Acting Under" Requirement Is Satisfied.

To satisfy the second requirement ("acting under" a federal officer) "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Jacks*, 701 F.3d at 1230 (holding that health insurer contracted by U.S. Office of Personnel Management was "acting under" a federal officer) (*quoting Watson*, 551 U.S. at 152). "The words 'acting under' are to be interpreted broadly." *Isaacson*, 517 F.3d at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813; *see also Jacks*, 701 F.3d at 1230 (although "not limitless, '[t]he words "acting under" are broad,' and the Supreme Court 'has made clear that the statute must be "'liberally

6

construed.'") (*quoting Watson*, 551 U.S. at 147); *see also Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) ("Here, Boeing plausibly alleged that it acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control. In doing so, Boeing's allegations adequately state that it was assisting or carrying out the duties of the United States Air Force.").

The "acting under" requirement is met here because Plaintiff directly challenges Defendants' alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. As discussed above, Aearo designed and manufactured the CAEv2 at the direction of the U.S. military to meet the military's specific needs to provide hearing protection.

Plaintiff's counsel have conceded in other cases that Aearo was "acting under" federal officers of the Department of Defense and its agencies when manufacturing and selling the CAEv2 he was provided. In the Complaint in *Cerula*, 19-cv-433 (D. Minn.), for example, Plaintiff's counsel alleged that Aearo specifically developed the CAEv2 for the military's use and to meet the military's specifications:

> • "Aearo developed dual-ended nonlinear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing servicemen a single set of earplugs that provide two options for hearing attenuation depending on how they are worn[.]" (*Cerula* Compl. ¶ 18.)

> • "Based on the supposed technological design and qualities of the Combat Arms™ earplugs, Defendants won a series of Indefinite-Quantity Contracts ('IQCs') to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012." (*Id.* ¶ 20.)

7

- "To win these IQCs, Defendants represented that the Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs." (*Id.* ¶ 21.)

- "In addition, the U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military." (*Id.* ¶ 28.)

Not only did Aearo meet "specific performance criteria established by the U.S. Government," it developed the CAEv2 under the direction of, and with significant involvement of, representatives of the U.S. military. *See e.g. Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding that defendant was "acting under" a federal officer because it "worked hand-in-hand with the government, assisting the federal government in building warships. 'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."); *Isaacson*, 517 F.3d at 137 ("Defendants contracted with the Government to provide a product that the Government was using during war—a product that, in the absence of Defendants, the Government would have had to produce itself."); *In re National Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1075-76 (N.D. Ohio 2018) (removal under § 1442 was appropriate were defendant was subject to "precise specifications" of government contract, administration of contract was overseen by federal official, and absent defendant's role, government would have had to warehouse and distribute product itself).

As described above, the military's involvement went beyond merely establishing standards. Its involvement also included such operational features as ensuring the CAEv2

8

would fit in military-issued containers. Such involvement is quintessential activity "acting under" a federal officer. *See e.g. Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors that manufactured Agent Orange); *Gordon v. Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 320 (E.D.N.Y. 2014) (contractor was "acting under" a federal officer for purposes of removal statute when it provided products used in construction of ships to Navy's precise specifications).

Plaintiff's allegation that his employer provided him with the CAEv2 "[a]fter they became commercially available" does not change that Aearo was "acting under" a federal officer when it designed the at-issue earplugs. For example, in *Stallings*, the defendant removed a case involving steam turbine engines originally designed for and with the U.S. Navy under the federal officer removal statute. *Stallings*, 2013 WL 1563231, at *1. Plaintiffs argued that defendants were not "acting under" a federal officer because defendant "manufactured the turbines for military and public consumption," which, according to plaintiff, "destroy[ed] Defendants' argument that the military had exclusive control" over the design. *Id.* at *3. The court rejected that argument (and denied plaintiff's motion to remand) because the turbines were designed to the military's specifications, and thus "[e]ven if Plaintiffs prove that [Defendants] sold these exact turbines to non-governmental entities, this does not undermine Defendants' demonstration, for the purpose of removal, that the Navy possessed extensive control over the design and manufacture of these turbines such that [Defendants'] production thereof was effectively acting under a federal agency. *Id.* So too in this case. Because the U.S. military "possessed extensive

9

control over the design and manufacture" of the CAEv2, Aearo was "effectively acting under a federal agency" even if Plaintiff proves that the CAEv2 were also available to non-governmental entities. *Id.*

### C. The "Causation" Requirement Is Satisfied.

The second prong, that a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted). Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Id.* Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Isaacson*, 517 F.3d at 137 (*citing Acker*, 527 U.S. at 431-32 (1999) ("demanding an airtight case on the merits in order to show the required causal connection" would "defeat the purpose of the removal statute").[3]  In 2011, Congress further expanded Section 1442 by amending section 2(b) to permit removal "for ***or relating to*** any acts under color" of federal office, so as "to broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. REP. 112-17, 6, 2011 U.S.C.C.A.N. 420, 425 (emphasis showing addition).

"To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred ***while*** Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original). Here, Plaintiff's claims arise from

---

[3] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

Defendants' production and sale of CAEv2 to military specifications. Plaintiff alleges that the design of the CAEv2 is defective. Aearo developed and designed the Combat Arms™ earplugs, including establishing its length, at the direction of federal officers.

Further, even if Plaintiff were to prove that any alleged defect was the result of an act not specifically contemplated by the government contract, "it is enough that the contracts gave rise" to the harm alleged. *See Isaacson*, 517 F.3d at 138. "[W]hether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer." *Id.* (*citing Willingham*, 395 U.S. at 409.)

### D. The "Colorable Federal Defense" Requirement Is Satisfied.

The fourth requirement (establishing a "colorable federal defense") is satisfied by 3M's assertion of the government contractor defense. Courts around the country have held that the government contractor defense supports removal under § 1442(a)(1). *See, e.g.*, *Jacks*, 701 F.3d at 1234-35 (government contractor defense supports removal under § 1442); *Isaacson*, 517 F.3d at 139 (same); *Zeringue v. Crane Co.*, 846 F.3d 785 (5th Circuit 2017) (same); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1200 (M.D. Fla. 2006) (government contractor defense supported removal under Section 1442).

A defendant need not prove its defense at the removal stage; a defendant need only show that a federal defense is "colorable." *Jacks*, 701 F.3d at 1235. Courts will not "require that these defenses be clearly sustainable in order to support removal under § 1442(a)(1)." *Id.* (*citing Willingham*, 395 U.S. at 406–07 ("[The federal officer removal

statute] is broad enough to cover all cases where federal officers can raise a colorable defense. . . . The officer need not win his case before he can have it removed.").)

At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116 (citing *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006)).[4] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Technologies Corp.,* 487 U.S. 500, 512 (1988).

---

[4] *See also Kraus v. Alcatel-Lucent*, Civil Action No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense.").

3M has satisfied all of these elements for purposes of removal. As discussed above, DLA established reasonably precise specifications governing double-ended non-linear earplugs' performance, testing, inspection, packaging, and labeling, with which the CAEv2 complied. Plaintiff's counsel has alleged in other cases that the CAEv2 were subject to stringent military specifications. (*Cerula* Compl. ¶ 21 ("Defendants represented that the Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs."), ¶ 28 ("the U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program.").) When properly used, the CAEv2 fully conform to those specifications.

Finally, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring the CAEv2 earplugs. The U.S. military was actively involved in discussions with Aearo in the development of the CAEv2 regarding its length and instructions for use. Aearo's engineers discussed the challenges, and trade-offs, in conforming the design of the CAEv2 to fit within the military's desired carrying cases and with its other equipment. These facts are more than enough to support a "colorable" government contractor defense and removal under the federal officer statute. *See Betzner*, 910 F.3d at 1016 (finding government contractor defense colorable where defendant provided plausible allegations it manufactured aircraft according to government specifications and government was aware of any potential hazards).

13

At minimum, this constitutes colorable evidence that the U.S. military generally "made a discretionary determination" regarding the requirements and design of the CAEv2's benefits against the alleged risks. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145, at *14 (E.D.N.Y. Sept. 30, 2018) (holding removal proper under §1442 because defendants presented "colorable evidence" that government was aware of alleged problems with product at issue); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *Agent Orange*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at *13.

Moreover, courts have recognized that the federal contractor defense applies even when (as alleged here) a product designed and manufactured originally for the military ends up in civilian hands. *See, e.g.*, *Glassco v. Miller Equip. Co*., 966 F.2d 641 (11th Cir. 1992) (civilian who bought allegedly defective military surplus lineman's belt was precluded from recovery for product defect by the military contractor defense), *Skyline Air Serv., Inc. v. G.L. Capps Co.*, 916 F.2d 977 (5th Cir. 1990) (military contractor was immune from liability for injuries stemming from the crash of a military surplus helicopter being used for commercial logging operations); *Jackson v. Deft, Inc.*, 223 Cal. App. 3d 1305, 1319 (Cal. Ct. App. 1990) (holding that, "if a product is produced according to military specifications and used by the military because of particular qualities which serve a military

14

purpose, and is incidentally sold commercially as well, that product may nonetheless still qualify as military equipment under the military contractor defense");*Megill v. Worthington Pump, Inc.*, 1999 WL 191565, at *3 (D. Del. Mar. 26, 1999) (similar).

## **<u>CONCLUSION</u>**

For all the foregoing reasons, 3M hereby removes this action from the Fourth Judicial District Court of Minnesota, Hennepin County, to this Court. As noted above, co-defendant Aero Technologies, LLC consents to this removal.


Dated: December 16, 2019          Respectfully submitted,

                                  s/ Benjamin W. Hulse
                                  Jerry W. Blackwell (MN #186867)
                                  Benjamin W. Hulse (MN #0390952)
                                  S. Jamal Faleel (MN #0320626)
                                  BLACKWELL BURKE P.A.
                                  431 South Seventh Street, Suite 2500
                                  Minneapolis, MN 55415
                                  Phone: (612) 343-3248
                                  Fax: (612) 343-3205
                                  Email: blackwell@blackwellburke.com
                                       bhulse@blackwellburke.com
                                       jfaleel@blackwellburke.com

                                  **Counsel for Defendant 3M Company**

| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

|  | Personal Injury |
|---|---|
| CHRISTOPHER GRAVES, |  |
| Plaintiff, | **SUMMONS** |
| v. |  |
| 3M COMPANY and<br>AEARO TECHNOLOGIES LLC, |  |
| Defendants. |  |

THIS SUMMONS IS DIRECTED TO ABOVE-NAMED DEFENDANTS:

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

   Schwebel Goetz & Sieben
   5120 IDS Center
   80 S. 8th Street
   Minneapolis, MN 55402

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

I hereby acknowledge that sanctions may be awarded pursuant to Minn. Stat. § 549.211.

Dated: December 3, 2019

SCHWEBEL GOETZ & SIEBEN, P.A.


By: _s/Alicia N. Sieben_____
William R. Sieben (#100808)
Alicia N. Sieben (#389640)
Matthew J. Barber (#397240)
5120 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402-2246
Telephone: 612-377-7777
Fax: 612-333-6311
Email: bsieben@schwebel.com
　　　　asieben@schwebel.com
　　　　mbarber@schwebel.com

GUSTAFSON GLUEK PLLC
Daniel Gustafson (#202241)
Amanda M. Williams (#341691)
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Fax: 612-339-6622
Email: dgustafson@gustafsongluek.com
          awilliams@gustafsongluek.com

BONDURANT, MIXSON & ELMORE, LLP
Michael B. Terry
Georgia Bar No. 702582 (*pro hac application
forthcoming*)
David G.H. Brackett
Georgia Bar No. 068353 (*pro hac application
forthcoming*)
Matthew R. Sellers
Georgia Bar No. 691202 (*pro hac application
forthcoming*)
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Telephone:    (404) 881-4100
Fax: (404) 881-4111
Email: terry@bmelaw.com
          brackett@bmelaw.com
          sellers@bmelaw.com

**ATTORNEYS FOR PLAINTIFF**

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |
| | Personal Injury |
| CHRISTOPHER GRAVES, | |
| Plaintiff, | **COMPLAINT** |
| v. | |
| 3M COMPANY and AEARO TECHNOLOGIES LLC, | |
| Defendants. | |

Plaintiff Christopher Graves brings this action against defendants 3M Company and Aearo Technologies LLC, and in support thereof alleges:

### NATURE OF THE CASE

1. This is a failure to warn product liability action related to an earplug manufactured and sold by Defendants. Plaintiff used Defendants' dual-ended Combat Arms™ Earplugs - Version 2 and, as a result of Defendants' failure to warn, now suffers from hearing loss and tinnitus. Defendants knew the earplugs needed to be inserted in a particular manner in order to have any effectiveness. But the Defendants failed to warn potential purchasers of the danger of failing to do so.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's claims under Minn. Stat. § 484.01, subd. 1.

3. This action is not removable to federal court because Plaintiff asserts no claim arising under the Constitution, law, or treaties of the United States to satisfy 28 U.S.C. § 1331 and because even though the requirements of 28 U.S.C. § 1332(a) may be met, Plaintiff brings this suit in Defendants' home state and therefore 28 U.S.C. § 1441(b)(2) precludes removal.

4. Venue is proper in Hennepin County, Minnesota under Minn. Stat. §§ 542.01 and 542.09 because 3M resides in Hennepin County in that it has its resident agent, an office, and a place of business in Hennepin County.

## PARTIES

5. Plaintiff is an individual residing in the state of Mississippi.

6. Defendant 3M is a Delaware corporation with its principal place of business in Minnesota.

7. Defendant Aearo Technologies LLC is a limited liability company formed in Delaware with its principal place of business in Minnesota.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Use of 3M Combat Arms™ Earplugs Version 2

8. Plaintiff been a police officer with the Collins, Mississippi Police Department since approximately February 1998. His responsibilities included running the gun range and teaching firearms tactics to fellow police officers.

9. Plaintiff has not served in the United States military.

1821741.2

10. Plaintiff purchased several pairs of Combat Arms™ version 2 earplugs to wear while he was on the gun range.

11. Plaintiff wore the Combat Arms™ earplugs during his employment and while shooting guns on the gun range and instructing other police officers. During such times, Plaintiff was exposed to damaging, loud impulse, high-pitched sounds.

12. Plaintiff did not receive instructions to fold back the third flange on the opposite side of the use end of the Combat Arms™ earplug or a warning that the earplug would not be effective if he did not do so.

13. Plaintiff suffers from hearing loss and tinnitus.

**B. Defendants' Manufacture and Testing of the Combat Arms™ Earplugs**

14. Aearo Technologies was the global market leader in hearing and eye protection and was based in Indianapolis, Indiana. Aearo Technologies developed, marketed, and sold the Combat Arms™ earplug until being acquired by 3M in 2008 for $1.2 billion. Afterwards, 3M hired Aearo's employees and maintains it as a separate operating unit. Post-acquisition, the Combat Arms™ earplugs have been marketed and sold under the 3M brand. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo are directed as a matter of law against 3M.

1821741.2

15. Aearo developed dual-ended, non-linear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing a single set of earplugs that provide two options for hearing attenuation depending on how they are worn:



16. The earplugs can be worn in an open or "unblocked" position (yellow end in) to block, or at least significantly reduce, loud impulse sounds, while still allowing the user to hear quieter noises. Alternatively, the earplugs can be worn in a closed or "blocked" position (green end in) to block, or at least significantly reduce, all sounds, i.e., operate as ordinary earplugs.

17. Defendants knew these earplugs, at a minimum, required special instructions for use as early as 2000.

18. At all relevant times, the Combat Arms™ earplugs had a tendency to imperceptibly loosen in the wearer's ear, thus allowing damaging sounds to enter the ear canal around the outside of the earplug. Specifically, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some wearers' ear canals and fold back to its original shape, thereby loosening the seal in their ear canals. Because the earplug is symmetrical, this occurs regardless of which end is inserted into the ear.

19. Aearo learned of this problem when it completed testing of the Combat Arms™ earplugs. In fact, in February 2000, after the Combat Arms™ earplugs failed specification testing, Aearo employees rolled back the non-inserted yellow flanges to mitigate the loosening effect.

20. The value and effectiveness of earplugs has been standardized under federal law through a Noise Reduction Rating ("NRR"). The testing and labeling of earplugs such as the Combat Arms™ earplugs to achieve an NRR is governed by federal regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to the Noise Control Act, 42 U.S.C. § 4901 *et seq.* Specifically, 40 C.F.R. § 211.206-1 provides:

> The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI-STD) S3.19-1974.

21. Further, 40 C.F.R. §211.204-4(e) requires that specific supporting information accompany hearing protection devices sold in the United States:

The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location.... **Instructions as to the proper insertion or placement of the device.**

(Emphasis added).

### C. Aearo's Test Results for the Combat Arms™ Earplugs Demonstrated the Need for a Warning and Special Fitting Instructions

22. The NRR is supposed to represent the amount of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act's testing methodology.

23. In or around January 2000, Aearo began NRR testing on each end of the Combat Arms™ earplug. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing without an earplug; (2) the subject's hearing with the open/ unblocked (yellow) end of the Combat Arms™ earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms™ earplug inserted.

24. Aearo's own employees monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR. This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms™ earplug inserted after only 8 of the 10 subjects

1821741.2

had been tested. At that point, the Combat Arms™ earplugs were failing expectations miserably. Aearo was expecting to achieve an NRR of 22 with the green end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects.

25. Despite stopping the test on the green end of the Combat Arms™ earplugs, Aearo had the remaining two test subjects complete the test with respect to the yellow end of the Combat Arms™ earplugs only because Aearo liked the low NRR rating the test was indicating to that point. After completion, however, testing of the yellow end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound. Aearo thus knew that the test was inaccurate and needed to be repeated. Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

26. After prematurely stopping the NRR test of the green end of the Combat Arms™ earplug, Aearo investigated the disappointing test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3. *See,* Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975).

27. Aearo also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third

subjects and the earplugs. As a result, some subjects had large standard deviations across trials on the yellow end test, which suppressed the NRR rating.

31. Nevertheless, Aearo did not re-test the yellow end using the manipulated fitting instructions like it did on the green end, i.e., folding back the flanges on the green end of the earplug before inserting the yellow end into the ear.

32. Aearo did not re-test the yellow end because it knew that it would not be able to obtain a 0 NRR (much less the facially invalid -2 NRR).

33. Moreover, the need for the special fitting instructions for the Combat Arms™ earplugs is more important during real-life use than in a lab where the NRR tests are performed over the span of just a few minutes and the head of the test subject remains virtually motionless during the test. Wearers, such as Plaintiff on the other hand, may wear the earplug for an extended period of time and are more active than test subjects in a lab.

34. Because the issue was imperceptible to the wearer, an improper fit would go undetected by those who wore them.

35. Defendants continued to sell the Combat Arms™ earplugs until 2016, at which time Defendants discontinued the earplug. *See* Discontinuation: 3M Combat Arms Earplugs Version 2 (Nov. 17, 2015)).

36. Defendants' failure to warn about the need for special fitting instructions for the Combat Arms™ earplugs caused Plaintiff to suffer hearing loss and tinnitus.

1821741.2

9

flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

28. Aearo later instructed test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear.

29. Using these manipulated fitting instructions, Aearo re-tested the green end of the Combat Arms™ earplugs starting in February 2000. During this re-test of the green end, test subjects folded back the yellow flanges of the earplug (essentially elongating the too-short stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit. Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat Arms™ earplug.

30. Due to the symmetrical nature of the Combat Arms™ earplugs, the problem that affected the fit of the green end similarly affected the fit of the yellow end. The fact that Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs (when used without the special instructions described above) did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the

1821741.2

8

37. At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's wrongful acts in marketing and selling the Combat Arms™ earplugs without warning of the need for modified fitting instructions.

### TOLLING OF STATUTES OF LIMITATIONS

38. Plaintiff could not, by the exercise of reasonable diligence, have discovered Defendants' wrongful acts as the cause of his injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing these injuries, until less than the applicable limitations period prior to the filing of this action.

39. Further, the running of the statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the risks associated with use of the Combat Arms™ earplugs without adhering to the specific fitting instructions discussed above.

40. Because of Defendants' failure to warn, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that he had been exposed to the risks alleged herein, and that those risks were the direct and proximate result of Defendants' acts and omissions.

1821741.2

41. Through Defendants' affirmative misrepresentations and omissions pertaining to the safety and efficacy of the Combat Arms™ earplugs, Plaintiff was prevented from discovering this information sooner because Defendants misrepresented and continued to misrepresent the risks associated with using the Combat Arms™ earplugs without adhering to the specific fitting instructions discussed above.

### COUNT I: PRODUCT LIABILITY – FAILURE TO WARN

42. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

43. Defendants are the manufacturers and sellers of the Combat Arms™ earplugs.

44. The Combat Arms™ earplugs that Defendants manufactured, distributed, and sold lacked adequate warnings, instructions, or labels at the time they left Defendants' control.

45. Defendants failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the Combat Arms™ earplug to fit correctly in the wearer's ear and create the seal necessary to block out damaging sounds.

46. Defendants had a duty to sell the Combat Arms™ earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiff. Defendants breached that duty.

47. Defendants had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms™ earplugs when worn in the ordinary course. Defendants breached that duty.

48. It was foreseeable to Defendants that the Combat Arms™ earplugs would be unreasonably dangerous if distributed without a warning regarding the risks of damage to the ear with an improper fit and/or modified fitting instructions.

49. Not only was it foreseeable, it was foreseen by Defendants. During testing, Defendants discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

50. Defendants also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

51. Defendants had a post-sale duty to warn of the above alleged product-related risks because Defendants knew or reasonably should have known that the Combat Arms™ earplug posed a substantial risk of harm to wearers, including Plaintiff, if used without adhering to specific fitting instructions; the wearer who used the Combat Arms™ earplug

1821741.2

12

can reasonably be assumed to be unaware of the risk of harm of using the Combat Arms™ earplugs without specific fitting instructions because the above alleged loosening effect was imperceptible; a warning or instruction showing how to correctly and safely use the Combat Arms™ earplug could have been effectively communicated to and acted upon by the wearer to whom a warning or instruction might be provided; and the risk of harm, including but not limited to hearing loss in wearers, is sufficiently great to justify the slight burden of providing a warning or instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

52. The Combat Arms™ earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms™ earplugs would allow damaging sounds to bypass the earplug thereby posing a serious risk to Plaintiff's hearing unbeknownst to Plaintiff.

53. The warnings and instructions that accompanied the Combat Arms™ earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ earplugs in a manner reasonably foreseeable to Defendants.

54. Had Plaintiff received a proper or adequate warning as to the risks associated with the use of the Combat Arms™ earplugs in the manner contemplated by Defendants, he would not have used them.

55. Additionally, and/or alternatively, had Plaintiff received the modified fitting instructions that were used by Defendants during the testing, which were not disclosed

1821741.2

to Plaintiff, Plaintiff would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

56. Plaintiff suffered injury and damage as a direct and proximate result of Defendants' failures to warn and/or provide adequate instructions regarding the dangerous condition of the Combat Arms™ earplugs that the Defendants manufactured, distributed, and sold.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests from Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, costs and attorneys' fees as follows:

A. Award of monetary damages, including compensatory relief, to which Plaintiff is entitled at the time of trial in an amount exceeding $50,000.

B. Award of pre- and post-judgment interest.

C. Award of costs.

D. Award of all such other and further relief as may be available at law or equity and may be proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

1821741.2

14

## ACKNOWLEDGMENT

The undersigned acknowledge sanctions may be imposed under Minn. Stat. § 549.211.

Dated: December 3, 2019                    SCHWEBEL GOETZ & SIEBEN, P.A.


By:  s/Alicia N. Sieben
William R. Sieben (#100808)
Alicia N. Sieben (#389640)
Matthew J. Barber (#397240)
5120 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402-2246
Telephone:  612-377-7777
Fax: 612-333-6311
Email: bsieben@schwebel.com
        asieben@schwebel.com
        mbarber@schwebel.com

GUSTAFSON GLUEK PLLC
Daniel Gustafson (#202241)
Amanda M. Williams (#341691)
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402
Fax: 612-339-6622
Email: dgustafson@gustafsongluek.com
        awilliams@gustafsongluek.com

BONDURANT, MIXSON & ELMORE, LLP
Michael B. Terry
Georgia Bar No. 702582 (*pro hac application
forthcoming*)
David G.H. Brackett
Georgia Bar No. 068353 (*pro hac application
forthcoming*)
Matthew R. Sellers
Georgia Bar No. 691202 (*pro hac application
forthcoming*)
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Telephone:    (404) 881-4100
Fax:  (404) 881-4111
Email: terry@bmelaw.com
        brackett@bmelaw.com
        sellers@bmelaw.com

**ATTORNEYS FOR PLAINTIFF**

1821741.2

16

| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |
| | Case type: Product Liability |

CHRISTOPHER GRAVES,

      Plaintiff,

v.

3M COMPANY and
AEARO TECHNOLOGIES LLC,

      Defendants.

Court File No. 27-CV-19-19916

**NOTICE OF FILING OF
NOTICE OF REMOVAL**

TO:  PLAINTIFF AND HIS ATTORNEYS, WILLIAM R. SIEBEN, ALICIA N. SIEBEN, MATTHEW J. BARBER, SCHWEBEL GOETZ & SIEBEN, P.A., 80 SOUTH EIGHTH STREET, SUITE 5120, MINNEAPOLIS, MN 55402.

PLEASE TAKE NOTICE that Defendant 3M Company has filed a Notice of Removal in the United States District Court for the District of Minnesota removing the civil action entitled *Christopher Graves, v. 3M Company and Aearo Technologies LLC*, from the District Court, Fourth Judicial District, County of Hennepin State of Minnesota to the United States District Court for the District of Minnesota.

FURTHER TAKE NOTICE that attached hereto is a copy of said Notice of Removal.

Dated: December 16, 2019        Respectfully submitted,

s/ *Benjamin W. Hulse*
Jerry W. Blackwell (MN #186867)
Benjamin W. Hulse (MN #0390952)
S. Jamal Faleel (MN #0320626)
BLACKWELL BURKE P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Phone: (612) 343-3200
Fax: (612) 343-3205
Email: blackwell@blackwellburke.com
       bhulse@blackwellburke.com
       jfaleel@blackwellburke.com

**Counsel for Defendant 3M Company**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____　DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____　AMOUNT _____　APPLYING IFP _____　JUDGE _____　MAG. JUDGE _____

**ATTACHMENT**

The JPML determined on April 3, 2019 that centralization is appropriate for these actions and consolidated all federal actions before Judge M. Casey Rodgers in the United States District Court, Northern District of Florida. *In re: 3M Combat Arms Earplug Prods. Liab. Litig*., MDL No. 2885 (Dkt. No. 343). The parties expect that this matter will be transferred to the MDL shortly.