EXHIBIT 3

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

CHRISTOPHER GRAVES,

      Plaintiff,

v.

3M COMPANY and
AEARO TECHNOLOGIES LLC,

      Defendants.

Case No. 0:19-cv-03094-ECT-TNL

**AMENDED NOTICE OF REMOVAL**

---

Defendant 3M Company ("3M") hereby files its amended notice of removal of this action, pursuant to 28 U.S.C. §§ 1441, 1442(a)(1), and 1446, to the United States District Court for the District of Minnesota.

As grounds for removal, 3M states as follows:

Plaintiff Christopher Graves seeks to hold Defendants 3M and Aearo Technologies LLC[1] liable for his tinnitus and hearing loss. (Compl. ¶ 13.) He contends that Combat Arms™ Earplugs, Version 2 ("CAEv2") manufactured and sold by Aearo were defectively designed and failed to provide adequate hearing protection, and that 3M and Aearo failed to warn Plaintiff of the alleged defective design. 3M denies these allegations. CAEv2, designed by Aearo in close collaboration with the U.S. military, represented a revolutionary breakthrough in hearing protection for service members. CAEv2 helped soldiers better

---

[1] 3M acquired Aearo Technologies, Inc. ("Aearo") in 2008. After acquiring Aearo in 2008, 3M continued to sell CAEv2. Aearo Technologies LLC, named in the Complaint, is a different entity from Aearo. Nonetheless, it consents to this removal.

maintain situational awareness (e.g., to hear nearby voice commands) while also maintaining some protection from gunfire and other higher decibel sounds. CAEv2 met the U.S. military's specifications and helped the military provide hearing protection to service members.

In this action, 3M intends to assert the federal government contractor defense. Even though Plaintiff alleges that his employer acquired the CAEv2 commercially, and that used the CAEv2 for a non-military purpose, the government contractor defense still applies. *See, e.g.*, *Stallings v. Georgia-Pac. Corp.*, 2013 WL 1563231, at *3 (W.D. Ky. Apr. 12, 2013) ("Plaintiffs further argue that GE manufactured the turbines for military and public consumption, thereby destroying Defendants' argument that the military had extensive control over GE and Crane. . . . Even if Plaintiffs prove that GE sold these exact turbines to non-governmental entities, this does not undermine Defendants' demonstration, for the purpose of removal, that the Navy possessed extensive control over the design and manufacture of these turbines such that GE's production thereof was effectively acting under a federal agency.").

The CAEv2 was designed at the request of and in consultation with the U.S military to meet the military's rigorous specifications. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is therefore entitled to remove this action to have its federal defenses adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed."

2

*Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008) (*citing Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 (2007)).

Removal is timely because this action was served on 3M on December 3, 2019. Venue is proper pursuant to 28 U.S.C. §§ 112(a) and 1441(a) because the Fourth Judicial District is located within this District. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff and a copy is being filed with the Clerk of the Fourth Judicial District.

## BACKGROUND

The CAEv2 is an earplug with two insertable ends developed specifically for the needs of the U.S. military for use as hearing protection in noisy environments. CAEv2 has a yellow end and green end. Each end has a different purpose. When the yellow end of the earplug is inserted, users can still hear nearby low-level sounds, like verbal communication, but receive protection from high-level impulse noise, like gunfire. In contrast, when the green end of the earplug is inserted, CAEv2 acts like a traditional earplug, providing steady and continuous protection from both ambient and impulse noise.

In the area of national defense, the U.S. military relies on close collaboration with private contractors to design and develop products, such as the CAEv2, and manufacture and supply those products in accordance with highly particular specifications balancing the multitude of operational and budgetary needs of equipping the nation's fighting forces. This litigation involves a classic example of that military-contractor collaboration.

CAEv2 was designed at the request of and in consultation with military audiologists, including Dr. Doug Ohlin. Ohlin at the time served in the capacity of Program Manager,

3

Hearing Conservation, U.S. Army Center for Health Promotion and Preventive Medicine (USACHPPM). Ohlin and his program gave direction to Aearo to ensure that the CAEv2 would appropriately balance performance with military operational needs for soldiers and Marines. For example, Ohlin proposed the inclusion of the filter that was a key updated feature of the CAEv2. Ohlin specifically directed Aearo to ensure that the CAEv2 would fit into a military-issued carrying case. Ohlin also was involved in Aearo's testing of the CAEv2.[2]

Following the development of the product, Ohlin was involved in the ultimate approval of CAEv2 for military use and proposed purchasing CAEv2 to the Joint Readiness Clinical Advisory Board. Dr. Ohlin was also involved in the development of training and wallet-sized instruction cards. The military's specifications for the CAEv2 reflect the design direction that Ohlin and his program gave to Aearo. In particular, these specifications are memorialized in a Medical Procurement Item Description (MPID) that was used by the Defense Logistics Agency (the U.S. military's purchasing authority), in soliciting bids from Aearo for the CAEv2. The MPID specified "military unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments," that should "be designed to provide protection from the unique noises created by military firearms, while allowing the wearer to clearly hear normal speech . . . such as voice commands, on the battlefield" and should be "camouflage green or another

---

[2] Ohlin's involvement continued following the military's decision to purchase and deploy the CAEv2. He provided Aearo with feedback from military personnel as to using the CAEv2 and developed training and instructions for military personnel.

4

suitable dark color." Importantly, the government also had hands-on involvement in developing and approving instructions for use to provide to service members.

In sum, the CAEv2 was launched at the request of, and in close coordination with, the U.S. military. The CAEv2's design and instructions for use reflect the specific direction and feedback of individuals acting on behalf of the U.S. military. The U.S. military purchased the CAEv2 and issued it servicemembers precisely because the CAEv2 fulfill the military's specifications and accomplishes the military's goal of balancing hearing protection with operational needs.

## BASES FOR FEDERAL JURISDICTION AND REMOVAL

### I. REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE.

Removal is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal rights under this section are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because Section 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, No. 11 Civ. 5990 (BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of s 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

The removing defendant must establish that: (1) the defendant is a "person" under the statute; (2) the defendant was "acting under" the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) the defendant was acting "under color of" federal office at the time of the allegedly tortious conduct; and (4) the defendant raises a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012). All requirements for removal under § 1442(a)(1) are satisfied here. *Cf., e.g.*, *Ayo v. 3M Co.*, No. 18-CV-0373 (JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in case where product liability was sought for defendants' product's conformance with military specifications).

### A. The "Person" Requirement Is Satisfied.

The first requirement for removal under Section 1442 is satisfied because 3M is a "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *Isaacson*, 517 F.3d at 135-36 (holding non-natural person to be a "person" under § 1442).

### B. The "Acting Under" Requirement Is Satisfied.

To satisfy the second requirement ("acting under" a federal officer) "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Jacks*, 701 F.3d at 1230 (holding that health insurer contracted by U.S. Office of Personnel Management was "acting under" a federal officer) (*quoting Watson*, 551 U.S. at 152). "The words 'acting under' are to be interpreted broadly."

6

*Isaacson*, 517 F.3d at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813; *see also Jacks*, 701 F.3d at 1230 (although "not limitless, '[t]he words "acting under" are broad,' and the Supreme Court 'has made clear that the statute must be "'liberally construed.'"") (*quoting Watson*, 551 U.S. at 147); *see also Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) ("Here, Boeing plausibly alleged that it acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control. In doing so, Boeing's allegations adequately state that it was assisting or carrying out the duties of the United States Air Force.").

The "acting under" requirement is met here because Plaintiff directly challenges Defendants' alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. As discussed above, Aearo designed and manufactured the CAEv2 at the direction of the U.S. military to meet the military's specific needs to provide hearing protection.

Plaintiff's counsel have conceded in other cases that Aearo was "acting under" federal officers of the Department of Defense and its agencies when manufacturing and selling the CAEv2 he was provided. In the Complaint in *Cerula*, 19-cv-433 (D. Minn.), for example, Plaintiff's counsel alleged that Aearo specifically developed the CAEv2 for the military's use and to meet the military's specifications:

7

- "Aearo developed dual-ended nonlinear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing servicemen a single set of earplugs that provide two options for hearing attenuation depending on how they are worn[.]" (*Cerula* Compl. ¶ 18.)

- "Based on the supposed technological design and qualities of the Combat Arms™ earplugs, Defendants won a series of Indefinite-Quantity Contracts ('IQCs') to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012." (*Id.* ¶ 20.)

- "To win these IQCs, Defendants represented that the Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs." (*Id.* ¶ 21.)

- "In addition, the U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent standards that may be established by other branches of the military." (*Id.* ¶ 28.)

Not only did Aearo meet "specific performance criteria established by the U.S. Government," it developed the CAEv2 under the direction of, and with significant involvement of, representatives of the U.S. military. *See e.g. Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding that defendant was "acting under" a federal officer because it "worked hand-in-hand with the government, assisting the federal government in building warships. 'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."); *Isaacson*, 517 F.3d at 137 ("Defendants contracted with the Government to provide a product that the Government was using during war—a product that, in the absence of Defendants, the Government would have had to produce itself."); *In re National Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1075-76 (N.D. Ohio 2018) (removal under § 1442 was appropriate were defendant was subject to "precise

8

specifications" of government contract, administration of contract was overseen by federal official, and absent defendant's role, government would have had to warehouse and distribute product itself).

As described above, the military's involvement went beyond merely establishing standards. Its involvement also included such operational features as ensuring the CAEv2 would fit in military-issued containers and drafting instructions for use for service members, including instructions advising service members to roll back the flanges of the product to achieve an optimum fit. Such involvement is quintessential activity "acting under" a federal officer. *See e.g. Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors that manufactured Agent Orange); *Gordon v. Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 320 (E.D.N.Y. 2014) (contractor was "acting under" a federal officer for purposes of removal statute when it provided products used in construction of ships to Navy's precise specifications).

Plaintiff's allegation that his employer provided him with the CAEv2 "[a]fter they became commercially available" does not change that Aearo was "acting under" a federal officer when it designed the at-issue earplugs. For example, in *Stallings*, the defendant removed a case involving steam turbine engines originally designed for and with the U.S. Navy under the federal officer removal statute. *Stallings*, 2013 WL 1563231, at *1. Plaintiffs argued that defendants were not "acting under" a federal officer because defendant "manufactured the turbines for military and public consumption," which, according to plaintiff, "destroy[ed] Defendants' argument that the military had exclusive

9

control" over the design. *Id.* at *3. The court rejected that argument (and denied plaintiff's motion to remand) because the turbines were designed to the military's specifications, and thus "[e]ven if Plaintiffs prove that [Defendants] sold these exact turbines to non-governmental entities, this does not undermine Defendants' demonstration, for the purpose of removal, that the Navy possessed extensive control over the design and manufacture of these turbines such that [Defendants'] production thereof was effectively acting under a federal agency. *Id.* So too in this case. Because the U.S. military "possessed extensive control over the design and manufacture" of the CAEv2, Aearo was "effectively acting under a federal agency" even if Plaintiff proves that the CAEv2 were also available to non-governmental entities. *Id.*

### C. The "Causation" Requirement Is Satisfied.

The second prong, that a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted). Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Id.* Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Isaacson*, 517 F.3d at 137 (*citing Acker*, 527 U.S. at 431-32 (1999) ("demanding an airtight case on the merits in order to show the required causal connection" would "defeat the purpose of the removal statute").[3] In 2011, Congress further expanded Section 1442 by

---

[3] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

10

amending section 2(b) to permit removal "for ***or relating to*** any acts under color" of federal office, so as "to broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. REP. 112-17, 6, 2011 U.S.C.C.A.N. 420, 425 (emphasis showing addition).

"To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred ***while*** Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original). Here, Plaintiff's claims arise from Defendants' production and sale of CAEv2 to military specifications. Plaintiff alleges that Defendants failed to warn him that the design of the CAEv2 was defective. Aearo developed and designed the Combat Arms™ earplugs, including establishing its length, at the direction of federal officers. The government also was directly involved in drafting the instructions for use for service members.

Further, even if Plaintiff were to prove that any alleged defect in design or warnings was the result of an act not specifically contemplated by the government contract, "it is enough that the contracts gave rise" to the harm alleged. *See Isaacson*, 517 F.3d at 138. "[W]hether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer." *Id.* (*citing Willingham*, 395 U.S. at 409.)

### D. The "Colorable Federal Defense" Requirement Is Satisfied.

The fourth requirement (establishing a "colorable federal defense") is satisfied by 3M's assertion of the government contractor defense. Courts around the country have held that the government contractor defense supports removal under § 1442(a)(1). *See, e.g.*,

11

*Jacks*, 701 F.3d at 1234-35 (government contractor defense supports removal under § 1442); *Isaacson*, 517 F.3d at 139 (same); *Zeringue v. Crane Co.*, 846 F.3d 785 (5th Circuit 2017) (same); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1200 (M.D. Fla. 2006) (government contractor defense supported removal under Section 1442).

A defendant need not prove its defense at the removal stage; a defendant need only show that a federal defense is "colorable." *Jacks*, 701 F.3d at 1235. Courts will not "require that these defenses be clearly sustainable in order to support removal under § 1442(a)(1)." *Id.* (*citing Willingham*, 395 U.S. at 406–07 ("[The federal officer removal statute] is broad enough to cover all cases where federal officers can raise a colorable defense. . . . The officer need not win his case before he can have it removed.").)

At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116 (citing *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006)).[4] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the

---

[4] *See also Kraus v. Alcatel-Lucent*, Civil Action No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense.").

12

defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

Under the government contractor defense, the defendant is not liable for alleged defects or negligence, or failure to warn, with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Technologies Corp.,* 487 U.S. 500, 512 (1988); *Sawyer v. Foster Wheeler LLC*, 841 F.3d 207, 211 (4th Cir. 2016) (holding that government contractor defense extends to failure-to-warn claims and noting that "[i]n addition to the multitude of authorities adopting this approach, the rationales identified in *Boyle* remain applicable in failure to warn cases")

3M has satisfied all of these elements for purposes of removal. As discussed above, the Defense Logistics Agency established reasonably precise specifications governing double-ended non-linear earplugs' performance, testing, inspection, packaging, labeling, with which the CAEv2 complied. Plaintiff's counsel has alleged in other cases that the CAEv2 were subject to stringent military specifications. (*Cerula* Compl. ¶ 21 ("Defendants represented that the Combat Arms™ earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs."), ¶ 28 ("the U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program.").) When properly used, the CAEv2 fully conform to those specifications.

Finally, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring the CAEv2 earplugs. The U.S. military was actively involved in discussions with Aearo in the development of the CAEv2 regarding its length and instructions for use. Aearo's engineers discussed the challenges, and trade-offs, in conforming the design of the CAEv2 to fit within the military's desired carrying cases and with its other equipment. These facts are more than enough to support a "colorable" government contractor defense and removal under the federal officer statute. *See Betzner*, 910 F.3d at 1016 (finding government contractor defense colorable where defendant provided plausible allegations it manufactured aircraft according to government specifications and government was aware of any potential hazards).

At minimum, this constitutes colorable evidence that the U.S. military generally "made a discretionary determination" regarding the requirements and design of the CAEv2's benefits against the alleged risks. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145, at *14 (E.D.N.Y. Sept. 30, 2018) (holding removal proper under §1442 because defendants presented "colorable evidence" that government was aware of alleged problems with product at issue); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest

14

such as military procurement," the government contractor defense applies. *Agent Orange*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at *13.

Moreover, courts have recognized that the federal contractor defense applies even when (as alleged here) a product designed and manufactured originally for the military ends up in civilian hands. *See, e.g.*, *Glassco v. Miller Equip. Co.*, 966 F.2d 641 (11th Cir. 1992) (civilian who bought allegedly defective military surplus lineman's belt was precluded from recovery for product defect by the military contractor defense), *Skyline Air Serv., Inc. v. G.L. Capps Co.*, 916 F.2d 977 (5th Cir. 1990) (military contractor was immune from liability for injuries stemming from the crash of a military surplus helicopter being used for commercial logging operations); *Jackson v. Deft, Inc.*, 223 Cal. App. 3d 1305, 1319 (Cal. Ct. App. 1990) (holding that, "if a product is produced according to military specifications and used by the military because of particular qualities which serve a military purpose, and is incidentally sold commercially as well, that product may nonetheless still qualify as military equipment under the military contractor defense"); *Megill v. Worthington Pump, Inc.*, 1999 WL 191565, at *3 (D. Del. Mar. 26, 1999) (similar).

## **CONCLUSION**

For all the foregoing reasons, 3M hereby removes this action from the Fourth Judicial District Court of Minnesota, Hennepin County, to this Court. As noted above, co-defendant Aero Technologies, LLC consents to this removal.

15

Dated: December 19, 2019

Respectfully submitted,

s/ Benjamin W. Hulse
Jerry W. Blackwell (MN #186867)
Benjamin W. Hulse (MN #0390952)
S. Jamal Faleel (MN #0320626)
BLACKWELL BURKE P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Phone: (612) 343-3248
Fax: (612) 343-3205
Email: blackwell@blackwellburke.com
   bhulse@blackwellburke.com
   jfaleel@blackwellburke.com

**Counsel for Defendant 3M Company**