*Associated Cases* ▾

# U.S. Bankruptcy Court
## Southern District of Indiana (Indianapolis)
## Adversary Proceeding #: 22-50068

*Assigned to:* Jeffrey J. Graham                                  *Date Filed:* 08/12/22
*Lead BK Case:* 22-02890-JJG-11
*Lead BK Title:* Aearo Technologies LLC and 3M Occupational
Safety LLC
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:*  14 Recovery of money/property - other


**Plaintiff**
-----------------------
**Nicholas thank Maciel**                          represented by **Ashley Keller**
                                                   Keller Postman LLC
                                                   150 N. Riverside Plaza
                                                   Suite 4100
                                                   Chicago, IL 60606
                                                   312-741-5220
                                                   Email: ack@kellerpostman.com


V.


**Defendant**
-----------------------
**3M Occupational Safety LLC**                     represented by **3M Occupational Safety LLC**
3M Center, Bldg. 224-5N-40                          PRO SE
St. Paul, MN 55144
Tax ID / EIN: 11-3838764


**Defendant**
-----------------------
**Aearo Holding LLC**                              represented by **Aearo Holding LLC**
7911 Zionsville Road                                PRO SE
Indianapolis, IN 46268
Tax ID / EIN: 65-1267302


**Defendant**
-----------------------
**Aearo Intermediate LLC**                         represented by **Aearo Intermediate LLC**
7911 Zionsville Road                                PRO SE
Indianapolis, IN 46268
Tax ID / EIN: 56-2443760

*Defendant*
-----------------------

**Aearo LLC**                                          represented by **Aearo LLC**
7911 Zionsville Road                                                    PRO SE
Indianapolis, IN 46268
Tax ID / EIN: 13-3840450


*Defendant*
-----------------------

**Aearo Technologies LLC**                   represented by **Aearo Technologies LLC**
7911 Zionsville Road                                                    PRO SE
Indianapolis, IN 46268
Tax ID / EIN: 13-3840356


*U.S. Trustee*
-----------------------

**U.S. Trustee**
Office of U.S. Trustee
46 E Ohio Street, Room 520
Indianapolis, IN 46204
317-226-6101
Email: ustpregion10.in.ecf@usdoj.gov

| Filing Date | # | Docket Text |
|---|---|---|
| 08/12/2022 | 1<br>(57 pgs) | Adversary case 22-50068. Complaint filed by Plaintiff(s) Nicholas thank Maciel against Defendant(s) 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC [14 (Recovery of money/property - other)]. (Keller, Ashley) (Entered: 08/12/2022) 🛈 |
| 08/12/2022 | | Receipt of Complaint( 22-50068) [cmp,cmp] (350.00) Filing Fee. Receipt number A33289113. Fee amount 350.00 (re: Doc # 1). (U.S. Treasury) (Entered: 08/12/2022) |
| 08/12/2022 | 2<br>(3 pgs) | Appearance filed by Ashley Keller on behalf of Plaintiff Nicholas thank Maciel. (Keller, Ashley) (Entered: 08/12/2022) 🛈 |
| 08/12/2022 | 3<br>(64 pgs; 2 docs) | Motion for Withdrawal of Reference and Designation of Record with Certificate of Service dated 8/12/2022, filed by Ashley Keller on behalf of Plaintiff Nicholas thank Maciel (re: Doc # 1). *Response to Motion for Withdrawal of Reference due by 08/26/2022. Designation of Additional Items to be Included in Record due by 08/26/2022.* (Attachments: (1) Dkt. No. 1) (Keller, Ashley) (Entered: 08/12/2022) 🛈 |
| 08/12/2022 | | Receipt of Motion for Withdrawal of Reference( 22-50068) [motion,mwdref] (188.00) Filing Fee. Receipt number |

A33289444. Fee amount 188.00 (re: Doc # [3]). (U.S. Treasury) (Entered: 08/12/2022)

*Generated in 1.14 seconds*

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/12/2022 15:24:26 | | | |
| **PACER Login:** | KellerAC | **Client Code:** | 3M |
| **Description:** | Docket Report | **Search Criteria:** | 22-50068 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: | Chapter 11 |
| AEARO TECHNOLOGIES LLC, ET AL., | Case No. 22-02890-JJG-11 |
| NICHOLAS MACIEL, | |
| Plaintiff, | |
| vs. | |
| 3M OCCUPATIONAL SAFETY LLC, AEARO HOLDING LLC, AEARO INTERMEDIATE LLC, AEARO LLC, AND AEARO TECHNOLOGIES LLC, | Adversary Case No. _____ |
| Defendants | |

## ADVERSARY COMPLAINT

Plaintiff Nicholas Maciel ("Plaintiff"), by and through the undersigned counsel, submit this Adversary Complaint ("Complaint") seeking judgment against Defendants 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (collectively, "Defendants") for personal injuries and sequelae thereto sustained from Defendants' unreasonably dangerous product, the dual-ended Combat Arms™ earplug (Version 2 CAEv.2) ("Dual-Ended Combat Arms Earplug"). At all relevant times, Defendants created, designed, assembled, manufactured, constructed, produced, tested, packaged, labeled, marketed, advertised, promoted, made, distributed, supplied, and/or sold the Dual-Ended Combat Arms Earplug.

## INTRODUCTION

1.      Plaintiff submits this Complaint to recover damages arising from hearing-related injuries and sequelae thereto caused by the Dual-Ended Combat Arms Earplug.

2.      Plaintiff used Defendants' dangerously defective Dual-Ended Combat Arms Earplug in myriad contexts.

3.      Defendants were aware of the defects and risks of the Dual-Ended Combat Arms Earplug but nonetheless supplied this dangerously defective product to Plaintiff and the United States military for more than a decade without Plaintiff or the United States military having any knowledge of those defects and risks.

4.      The defective design of the Dual-Ended Combat Arms Earplug prevented Plaintiff from obtaining a proper fit and seal when inserting the device into their ear canals.

5.      The defective design of the Dual-Ended Combat Arms Earplug also caused the device to loosen imperceptibly in Plaintiff's ear canals.

6.      As a result of the dangerously defective design of the Dual-Ended Combat Arms Earplug, the device did not remain sealed to Plaintiff's ear canals and thus allowed damaging sounds to enter Plaintiff's ear canals, unbeknownst to Plaintiff and the United States military.

7.      Defendants failed to warn or instruct Plaintiff or the United States military of the defects and risks related to the Dual-Ended Combat Arms Earplug.

8.      Use of Defendants' Dual-Ended Combat Arms Earplug has caused Plaintiff to suffer hearing loss, tinnitus, and/or additional hearing-related injuries.

9.      Defendants provided the Dual-Ended Combat Arms Earplug to Plaintiff and/or the United States military between approximately 2003 and 2015.

2

10.    Defendants' Dual-Ended Combat Arms Earplug has caused thousands upon thousands, if not millions, of innocent civilians and military personnel to suffer hearing loss, tinnitus, and/or additional hearing-related injuries, including but not limited to pain, suffering, and loss of fundamental life pleasures.

## JURISDICTION AND VENUE

11.    The United States Bankruptcy Court for the Southern District of Indiana (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the Southern District of Indiana, dated July 11, 1984.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## PARTIES

13.    Plaintiff is a Nevada citizen.

14.    Defendant 3M Occupational Safety LLC is a Delaware limited liability company with its principal place of business in Minnesota.

15.    Prior to the merger of Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (collectively, "Aearo Defendants") with non-debtor 3M Company ("3M") and 3M Occupational Safety LLC in 2008, Aearo Defendants were each incorporated in Delaware with a principal place of business in Indiana.

16.    Following the merger, Aearo Defendants were each incorporated in Delaware with a principal place of business in Minnesota or Indiana.

17.    Defendant Aearo Technologies LLC's sole member is Defendant Aearo LLC, whose sole member is Defendant Aearo Intermediate LLC, whose sole member is Defendant

3

Aearo Holding LLC, whose sole member is Defendant 3M Occupational Safety LLC, whose sole member is Defendant 3M.

18.    Defendant Aearo Holding LLC is a subsidiary of 3M Company.

19.    Defendant Aearo Holding LLC is a Delaware limited liability company with a principal place of business in Minnesota.

20.    Defendant Aearo Holding LLC was formerly known as Aearo Holding Corporation.

21.    Defendant Aearo Intermediate LLC is a subsidiary of Defendant 3M Company.

22.    Defendant Aearo Intermediate LLC is a Delaware limited liability company with a principal place of business in Indiana.

23.    Defendant Aearo Intermediate LLC was formerly known as Aearo Technologies Inc.

24.    Defendant Aearo LLC is a subsidiary of Defendant 3M Company.

25.    Defendant Aearo LLC is a Delaware limited liability company with a principal place of business in Indiana.

26.    Defendant Aearo LLC was formerly known as Aearo Corporation.

27.    Defendant Aearo Technologies LLC is a subsidiary of Defendant 3M.

28.    Defendant Aearo Technologies LLC is a Delaware limited liability company with a principal place of business in Indiana.

29.    At all relevant times, Defendant Aearo Technologies LLC conducted business under two assumed names: Aearo Company and Aearo Technologies.

## FACTUAL ALLEGATIONS

### *Defendants' Creation of the Dual-Ended Combat Arms Earplug*

30.     The Dual-Ended Combat Arms Earplug is a one-sized, dual-ended, triple-flanged earplug that Defendants created, manufactured, constructed, assembled, designed, tested, promoted, advertised, marketed, distributed, and/or sold to civilians and the United States military from approximately 2003 to 2015.

31.     Each end of the Dual-Ended Combat Arms Earplug incorporates a single-ended, triple-flanged earplug called the Ultrafit, which Defendants also designed.



32.     Defendants patented this "multi flanged earplug" design on September 19, 1989, as set forth in further detail in U.S. Patent No. 4,967,149.

33.     Although both ends of the Dual-Ended Combat Arms Earplug use the same Ultrafit earplug, Defendants designed each end to serve a different purpose.

34.     Defendants designed the olive-colored end of the Dual-Ended Combat Arms Earplug to block as much sound as possible, just like the single-ended Ultrafit earplug initially designed by Defendants.

35.     Defendants referred to the olive-colored end of the Dual-Ended Combat Arms Earplug as the "closed," "blocked," or "linear" end.

5

36.     Unlike the olive-colored end, the yellow-colored end of the Dual-Ended Combat Arms Earplug is attached to a channel containing a non-linear filter, which provides level-dependent hearing protection so that users can hear low-level sounds (*e.g.*, close-range conversation), while also blocking loud impulse sounds (*e.g.*, gunfire).

37.     Defendants referred to the yellow-colored end of the Dual-Ended Combat Arms Earplug as the "open," "unblocked," or "non-linear" end.

38.     Drs. Pascal Hamery and Armand Dancer from the French-German Institute of Saint Louis ("ISL") designed and patented the non-linear filter in 2000.

39.     According to U.S. Patent No. 6,068,079, ISL's non-linear filter uses a "simple design permitting improved filtering performance."

40.     The filter is "placeable in the external auditory canal of a user by means of an earplug" and may be used "in a military or industrial environment," providing protection from "noise from firearms of all calibers or from industrial machines, such as metallurgical presses."

41.     Dr. Hamery of ISL also designed and patented the "double-ended" design of the Dual-Ended Combat Arms Earplug in 2000.

42.     According to U.S. Patent No. 6,070,693, ISL's "double-ended" earplug "can function either in a selective attenuation mode or a maximum attenuation mode," allowing users to "choose between two operating modes of attenuation."

43.     ISL's patent of the "double-ended" design makes clear that "[t]he hearing protector is intended to be sealingly inserted into the auditory canal of the user."

44.     Thus, in addition to designing, developing, and patenting the non-linear filter used in the Dual-Ended Combat Arms Earplug, Dr. Hamery also designed and patented the "double-ended" design of the Dual-Ended Combat Arms Earplug.

6

45.    Defendants subsequently purchased both patents from ISL and/or obtained an exclusive license from ISL to use both patents in the Dual-Ended Combat Arms Earplug.

46.    Defendants created the Dual-Ended Combat Arms Earplug by inserting ISL's non-linear filter into a channel that connected the two ends of their triple-flanged Ultrafit earplug, resulting in a "double-ended" earplug intended for linear and non-linear attenuation as covered by U.S. Patent Nos. 4,867,149; 6,068,079; and 6,070,693.

47.    On October 7, 2015, Jeff Hamer of 3M testified that Defendants' Dual-Ended Combat Arms Earplug uses the "same basic notion of taking a plug, like the Ultrafit plug, forming it with a channel in it, and then putting [the ISL] filter in it."

48.    Likewise, on April 24, 2013, Doug Ohlin of 3M testified that "all [Defendants] had to do was insert the [ISL] filter" into Defendants' preexisting design of the triple-flanged Ultrafit earplug because "the hole was already there."

49.    The Ultrafit earplug already contained a small hole in its channel for a "music filter."

50.    Mr. Ohlin testified that the United States military purchased the Dual-Ended Combat Arms Earplug without providing any product "specifications" whatsoever because Defendants developed a technologically simple earplug that was "ready to go" prior to the military's interest in the product.

51.    Thus, according to internal documents that Defendants have already produced in this case, "3M is the creator" of the Dual-Ended Combat Arms Earplug.

### *Civilian and Military Use*

52.    Given the preexisting design of the Dual-Ended Combat Arms Earplug, which supposedly offered a "low tech" solution for protecting users from harmful noises, the United

States military assigned the Dual-Ended Combat Arms Earplug a national stock number and began purchasing the device in approximately 2003, after the product had already entered the commercial market.

53.    Defendants directly and/or indirectly supplied the Dual-Ended Combat Arms Earplug to military personnel and civilians, including Plaintiff, from at least 2003 to 2015, regardless of wartime, combat, and/or military-related exigencies.

54.    Bryan McGinley, who testified as 3M's corporate representative on April 3, 2013, asserted that "we don't differentiate between [private sector companies and governmental entities] with any of our products."

55.    Likewise, Elliott Berger, the Division Scientist of 3M's Personal Safety Division, testified on October 8, 2015, that the Dual-Ended Combat Arms Earplug is "sold in markets other than just the military."

56.    Defendants supplied their commercial distributors with "blister pack version[s] of the Dual-Ended CAE," specifically "packed for retail stores."

57.    The part number and/or SKU of the device was 370-1011.

58.    Mr. Berger of 3M touted the Dual-Ended Combat Arms Earplug to civilians as "ideal for outdoor shooting and hunting" because the device provided "good protection" for "thousands of rounds fired at indoor reverberant ranges."

59.    Civilians and military personnel, including Plaintiff, relied on Defendants' representations that the Dual-Ended Combat Arms Earplug is safe, effective, and provides two different options for adequate hearing attenuation and/or protection depending upon which end of the device is inserted into the user's ear.

60.     In addition to selling the Dual-Ended Combat Arms Earplug to civilians and the United States military, Defendants marketed, distributed, and sold the Dual-Ended Combat Arms Earplug commercially under different product names.

61.     For instance, among other products, Defendants' ARC earplug is structurally and technologically identical to the Dual-Ended Combat Arms Earplug.



62.     On October 21, 2015, Bob Moses of 3M testified that there is no material "difference between Combat Arms and an ARC plug in terms of structure."

63.     In other words, as another 3M executive put it, "[t]he ARC plug and Dual End Combat Arms plug are the same except for the colors used."

64.     Defendants initially marketed and sold the ARC earplug to civilians who frequently encountered potential electric arc hazards, such as electrical linemen.

65.     Defendants then targeted the ARC earplug to a broader commercial market, ranging from "utilities businesses" to "the food processing industry."

66.     Given this identical commercial product, Defendants did not design or develop the Dual-Ended Combat Arms Earplug for exclusive military use.

67.     Defendants designed and developed the Dual-Ended Combat Arms Earplug for a wide variety of users.

*Defendants' Testing of the Dual-Ended Combat Arms Earplug*

68.    Federal and industry regulations required Defendants to test the safety and efficacy of the Dual-Ended Combat Arms Earplug before distributing, supplying, and/or selling the device to civilians and the United States military.

69.    Environmental Protection Agency ("EPA") regulations codified in 30 CFR 211.201 et seq., and the Noise Control Act, 42 U.S.C. § 4901 et seq., specifically regulate labeling and testing of hearing protection devices.

70.    Hearing protection devices are classified by their potential to reduce noise in decibels ("dB"), a term used to categorize the power or density of sound.

71.    Hearing protection devices must be tested pursuant to the American National Standards Institute ("ANSI") in accordance with guidelines promulgated by the Occupational Safety & Health Administration ("OSHA").

72.    These guidelines require manufacturers of hearing protection devices to test for and label their devices with a Noise Reduction Rating ("NRR").

73.    An NRR is a unit of measurement used to determine the effectiveness of hearing protection devices in decreasing sound exposure in certain environments.

74.    The noise measurement procedure published by ANSI, also known as ANSI S3.19-1974, governs the NRR labeling and testing of hearing protection devices.

75.    The higher the NRR number associated with a hearing protection device, the greater the potential for noise reduction in certain environments.

76.    The Environmental Protection Agency requires manufacturers of hearing protection devices to provide accurate NRRs on the labels of their devices.

10

*Systemic Testing Bias*

77.    Instead of hiring an independent laboratory to test the NRRs of their hearing protection devices, Defendants have regularly used their own EARCAL laboratory for that purpose since at least December 1999.

78.    The EARCAL laboratory is located in Indianapolis, Indiana.

79.    Unlike independent laboratories, the EARCAL laboratory used and uses inappropriate testing procedures that substantially skew the results of the NRR labeling tests that Defendants perform on their own hearing protection devices.

80.    Mr. Berger has managed the EARCAL laboratory since at least 1999.

81.    Mr. Berger testified at his October 8, 2015 deposition that instead of using randomized panels of test subjects, Defendants "preselect[] people to test out particular types of products," which ultimately "increase[s] the NRRs" of Defendants' hearing protection devices.

82.    EARCAL lab technician Ronald Kieper likewise testified at his October 9, 2015 deposition that Defendants only use panels of individuals who are "able to consistently obtain [the] best fit on [a] particular type of hearing protector" and that limiting panels to such subjects in turn "raise[s] the NRR" of Defendants' hearing protection devices, including the Dual-Ended Combat Arms Earplug.

83.    Defendants have also used the so-called "Dixon Outlier Test" to exclude undesirable data from labeling tests on their hearing protection devices.

84.    Mr. Hamer of 3M admitted at his October 7, 2015 deposition that Defendants' reliance on the Dixon Outlier Test is anathema to "statistical rules."

85.    In addition, Defendants' use of their own EARCAL laboratory allows the "biases" of their "lab guys" to go unchecked, unlike in an independent laboratory.

11

86.     As a result of Defendants' biases and improper testing procedures, Mr. Berger acknowledged at his October 8, 2015 deposition that Defendants previously received a "large fine" from the EPA for "using every legal trick in the book to get the highest NRRs possible" for their hearing protection devices.

87.     Specifically, on April 6, 1993, Defendants agreed to pay a $900,000 civil penalty to settle allegations that they had inaccurately labeled their single-ended foam earplugs as having a 35 NRR when in fact the NRR was only 29.

### *January 2000 Testing*

88.     Despite this "six-figure fine" and ongoing concern that the EARCAL laboratory "could be setting Aearo up for another fine," Defendants continued using "every legal trick in the book" when testing the Dual-Ended Combat Arms Earplug.

89.     The EARCAL laboratory began testing the Dual-Ended Combat Arms Earplug in approximately December 1999 or January 2000.

90.     The first test of the Dual-Ended Combat Arms Earplug, which Defendants identified as "Test 213015," involved the closed, blocked, or linear end of the device.

91.     The next test of the Dual-Ended Combat Arms Earplug, which Defendants designated as "Test 213016," involved the open, unblocked, or non-linear end of the device.

92.     Defendants intended both of these tests to be NRR labeling tests.

93.     Mr. Berger admitted so at his October 8, 2015 deposition, averring that he believed Test 213015 was a "labeling test" when Defendants started the test.

94.     Similarly, on October 9, 2015, Mr. Kieper testified at his deposition that "both of those [tests] were supposed to be labeling tests."

95.    Because Defendants intended Test 213015 and Test 213016 to be labeling tests, Defendants could not terminate the tests prior to completion.

96.    Nor could Defendants sell a hearing protection device such as the Dual-Ended Combat Arms Earplug based on incomplete labeling testing.

97.    For example, Mr. Hamer testified at his October 7, 2015 deposition that Defendants could not stop a labeling test "if the product [did not] fit right."

98.    For each labeling test, Defendants selected ten subjects to test the Dual-Ended Combat Arms Earplug, many of whom were their own employees rather than randomly selected individuals from the general public.

99.    To determine the NRR of each end of the Dual-Ended Combat Arms Earplug, Defendants designed the labeling tests to capture: (1) each subject's hearing without an earplug; (2) each subject's hearing with the closed end of the Dual-Ended Combat Arms Earplug inserted according to standard procedures for proper use; and (3) each subject's hearing with the open end of the Dual-Ended Combat Arms Earplug inserted according to standard procedures for proper use.

100.    Defendants monitored the results of each subject during the testing.

101.    After testing only eight of the ten subjects in Test 213015, Defendants terminated the test of the closed end of the Dual-Ended Combat Arms Earplug.

102.    Mr. Berger told Mr. Kieper to terminate the test of the closed end of the device because the average NRR of the eight subjects was only 10.9.

103.    Mr. Hamer of 3M also testified at his October 7, 2015 deposition that a 10.9 NRR provided "insufficient" protection for civilians and military personnel.

13

104.    Even an NRR of 17, explained Mr. Hamer, would be too low and thus not a "desirable NRR for the closed" end of the Dual-Ended Combat Arms Earplug.

105.    Defendants' internal documents likewise acknowledge that a 17 NRR provides "low attenuation" and thus insufficient protection from harmful noises.

106.    After the aborted test, Defendants investigated the cause of the "low" NRR rating for the closed end of the Dual-Ended Combat Arms Earplug.

107.    Defendants determined that when users inserted the closed end of the Dual-Ended Combat Arms Earplug into their ears, the edge of the third flange of the open end of the earplug pressed against the users' ears and folded backwards. When the inward pressure on the earplug released, the folded flange on the open end pushed back into its original shape and caused the earplug to loosen imperceptibly.

108.    In fact, Mr. Kieper testified that when he fitted each subject with the closed end of the Dual-Ended Combat Arms Earplug according to standard instructions, "the flanges of the yellow [open] end would sometimes come into contact with their ear, and that would prevent [users from] getting the solid [closed] end in their ear deep enough to provide a seal."

109.    Mr. Kieper also emphasized that upon fitting the test subjects with the Dual-Ended Combat Arms Earplug, "they didn't realize it was coming out."

110.    Defendants therefore concluded that if used as designed and intended, the Dual-Ended Combat Arms Earplug would loosen imperceptibly and provide "inadequate" hearing protection.

111.    Such imperceptible loosening would in turn allow harmful sounds to move around the totality of the earplug instead of through it, thus entering the user's ear canal and damaging the user's hearing.

14

112.    Given the symmetrical nature of the product with regard to its flanges, Defendants knew in 2000 that the design of the Dual-Ended Combat Arms Earplug prevented a proper fit and seal when inserting either end of the device into the user's ear canal according to standard fitting procedures.

113.    Tellingly, when testing the open end of the Dual-Ended Combat Arms Earplug in Test 213016, Defendants obtained an NRR of -2.

114.    An NRR of -2 indicated that the open end of the Dual-Ended Combat Arms Earplug actually amplified sound rather than attenuated sound, as intended.

115.    Defendants knew "something went wrong" in Test 213016 given the negative NRR rating and "unusually high" standard deviations of the test results.

116.    Defendants also knew that NRR "[v]alues less than 0 make no sense."

117.    Unsurprisingly, then, Mr. Hamer testified that "the hearing protection device was perhaps not fitted correctly," and Mr. Kieper further testified that "the green flanges were causing the yellow end to come out of [the user's] ear."

118.    Without informing Plaintiff or the United States military, Defendants brazenly and perniciously inflated the -2 NRR to a 0 NRR.

119.    Defendants have displayed the 0 NRR on the packaging of the Dual-Ended Combat Arms Earplug ever since they began supplying the device.

120.    Defendants have also continued to display the fabricated 0 NRR despite subsequent in-house and independent testing that generating significantly different NRRs for the open end of the device.

121.    Worse, Defendants touted the obviously invalid 0 NRR as a benefit of the open end of the device, routinely representing that soldiers and civilians would be able to hear quiet, close-range conversation despite being protected from louder, harmful noises.

122.    In reality, however, Defendants knew all the way back in 2000 about the Dual-Ended Combat Arms Earplug's dangerously defective design, which not only prevents users from obtaining a proper fit and seal, but also causes the device to loosen imperceptibly regardless of which end of the device is inserted into the user's ear.

123.    Ultimately, both ends of the Dual-Ended Combat Arms Earplug allow high-level and dangerous sounds to move around the unsealed earplug and enter the user's ear, causing hearing loss, tinnitus, and/or other hearing-related injuries.

### *February 2000 Testing*

124.    Defendants re-tested the closed end of the device beginning in February 2000.

125.    Defendants identified this test as "Test 213017" and used a different panel of subjects than they used in Test 213015.

126.    Defendants also used different insertion instructions than in Test 213015, contrary to the standard instructions that would be provided to civilians and military personnel.

127.    Defendants conducted this retesting despite the fact that EARCAL lab policies and procedures did not allow retesting a hearing protection device by reconfiguring the device.

128.    In Test 213017, Defendants folded back the yellow flanges of the open end of the earplug prior to inserting the closed end into each subject's ear.

129.    This reconfigured fitting procedure ostensibly created a tighter fit and seal than the standard fitting procedure that Defendants had used in Test 213015.

130.     As a result of Test 213017, Defendants learned in 2000 that when the flanges of the open end of the Dual-Ended Combat Arms Earplug were folded back prior to inserting the closed end of the earplug into the user's ear, the flanges of the open end neither touched the user's conchae nor disturbed the seal of the earplug.

131.     Using this reconfigured insertion procedure, Defendants obtained an NRR of 21, almost twice the NRR of 10.9 generated in Test 213015.

132.     Still unsatisfied, Defendants excluded the data of one subject and retested that subject in May 2000, further manipulating the results of Test 213017.

133.     Based on the additional retest of that subject and the modified fitting procedures used in Test 213017, Defendants increased the NRR to 22 on the closed end of the Dual-Ended Combat Arms Earplug, more than doubling the NRR compared to Test 213015, which used Defendants' standard fitting procedures.

134.     Defendants have displayed this manipulated 22 NRR on the packaging of the Dual-Ended Combat Arms Earplug ever since this device was first made available to civilian consumers and military personnel such as Plaintiff.

135.     Defendants have done so even though Test 213015 generated a 10.9 NRR and subsequent testing of the closed end of the device also yielded NRRs lower than 22.

136.     For example, a five-subject test in June 2005, which Defendants identified as Test 215508, yielded a 15 NRR.

137.     In addition, a three-subject test in April 2007, which Defendants identified as Test 215516, yielded a 14 NRR.

138.     Defendants, however, never warned civilians, military personnel, or the United States military that they obtained the 22 NRR by testing the Dual-Ended Combat Arms Earplug

17

on an unrepresentative panel of subjects, that they manipulated the test data of those unrepresentative subjects, or that they reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects.

139.    Mr. Hamer testified at his October 7, 2015 deposition that Defendants' testing of the Dual-Ended Combat Arms Earplug "with the flange rolled back [was] improper" and that "the labeling test that 3M's using for Combat Arms Version 2 for the green end is not the appropriate test."

140.    In stark contrast to folding back the opposing flanges of the Dual-Ended Combat Arms Earplug when retesting the closed end of the device, Defendants did not retest the open end based on that reconfigured fitting procedure.

141.    On multiple occasions, however, Defendants did retest the open end of the Dual-Ended Combat Arms Earplug using standard fitting procedures.

142.    For instance, a ten-subject test in June 2004, which Defendants identified as Test 215009, yielded a -1 NRR for the open end of the Dual-Ended Combat Arms Earplug.

143.    But Defendants once again scratched that invalid value and improperly labeled the open end of the Dual-Ended Combat Arms Earplug with a 0 NRR.

144.    To make matters worse, Defendants continued to label the open end of the Dual-Ended Combat Arms Earplug with a 0 NRR despite subsequent testing generating positive NRRs.

145.    For example, a five-subject test conducted in June 2005, which Defendants identified as Test 215507, yielded a 4 NRR.

146.    Another five-subject test conducted in June 2005, which Defendants identified as Test 215511, yielded a 6 NRR.

147.    Yet another five-subject test conducted in September 2005, which Defendants identified as Test 215515, yielded a 5 NRR.

148.    And a ten-subject test conducted in April 2006, which Defendants identified as Test 215012, yielded a 5 NRR.

149.    Faced with these conflicting NRRs, Defendants' internal documents admit that "[w]e are unsure of the correct [NRR] for the open end of the Combat Arms Ver 2 [and] that later [NRR] tests are the more appropriate."

150.    Though Defendants' internal testing demonstrated that the Dual-Ended Combat Arms Earplug created "significantly more attenuation in the open position which should detract from situational awareness," Defendants continued to label the device with a 0 NRR because "lower attenuation is more desirable" for the open end of the device.

151.    Indeed, Defendants told civilians and the United States military that the open end of the Dual-Ended Combat Arms Earplug enhanced "situational awareness" by allowing the user to hear low-level sounds between impulse noises.

152.    Ultimately, given Defendants' intentional manipulation and misrepresentation of the NRRs for both ends of the Dual-Ended Combat Arms Earplug, new employees who evaluated the internal testing of the device called the 22 NRR for the closed end and the 0 NRR for the open end an utter "mystery."

### *Defendants' False Claims About the Dual-Ended Combat Arms Earplug*

153.    Following Defendants' deceptive and unlawful testing of the Dual-Ended Combat Arms Earplug, Defendants and/or their distributors sold the device commercially and then to the United States military beginning in or around 2003.

154.    Defendants and/or their distributors continued to sell the Dual-Ended Combat Arms Earplug to civilians and the United States military until at least November 2015, when Defendants discontinued the Dual-Ended Combat Arms Earplug.

155.    Defendants therefore sold the Dual-Ended Combat Arms Earplug commercially and to the military for over a decade, reaping millions of dollars in ill-gotten profits from selling this defective product each year it was on the market.

### *Inaccurate Noise Reduction Ratings*

156.    From at least 2003 to 2015, Defendants inaccurately represented the NRRs of both the open end and closed end of the Dual-Ended Combat Arms Earplug.

157.    Specifically, Defendants falsely marketed, advertised, and promoted the closed end of the Dual-Ended Combat Arms Earplug to civilians and the United States military as a linear earplug with a 22 NRR.

158.    However, Defendants' internal testing revealed that the NRR of the closed end of the Dual-Ended Combat Arms Earplug is only 10.9 when used according to the standard instructions for "proper use" that came with the device.

159.    Defendants also falsely marketed, advertised, and promoted the open end of the Dual-Ended Combat Arms Earplug to civilians and the United States military as providing adequate level-dependent hearing protection with a 0 NRR.

160.    However, Defendants' initial test revealed that the NRR of the open end of the Dual-Ended Combat Arms Earplug was -2, while later tests generated NRRs ranging from -1 to 6, leaving Defendants entirely "unsure" about the true NRR for the open end of the device.

161.    Defendants thus falsely represented that the Dual-Ended Combat Arms Earplug provided civilians and military personnel with two different hearing protection options for providing adequate hearing protection regardless of which end of the plug was used.

162.    This was one alleged benefit that Plaintiff and the United States military relied on in purchasing and/or using the Dual-Ended Combat Arms Earplug.

### *Inadequate Instructions and Warnings*

163.    Defendants also directly and/or indirectly supplied, sold, and/or distributed the Dual-Ended Combat Arms Earplug to civilians and military personnel without disclosing or warning about the defective design of the product.

164.    Defendants were aware no later than 2000 of the dangerously defective design of the Dual-Ended Combat Arms Earplug and that the device inadequately protected the hearing of civilian and military users such as Plaintiff.

165.    Specifically, Defendants knew the Dual-Ended Combat Arms Earplug could loosen in the user's ear—imperceptible to not only the user but also audiologists visually observing the user—thereby permitting damaging sounds to enter the user's ear through leaks in the seal between the user's ear and the earplug.

166.    Yet, Defendants did not adequately warn of the dangerous design defects of the Dual-Ended Combat Arms Earplug, despite their knowledge of the same.

167.    Defendants also did not adequately warn or instruct users, including Plaintiff, how to wear and insert the Dual-Ended Combat Arms Earplug in order to achieve the NRR ratings that Defendants advertised and promoted over the years.

168.    Although Defendants issued standard instructions for "proper use" of the Dual-Ended Combat Arms Earplug, the instructions did not instruct all users to fold back the opposing flanges of the earplug before inserting the device into their ears.

169.    Defendants' standard instructions also did not warn users that the unrepresentative panel of ten subjects who tested the Dual-Ended Combat Arms Earplug in Test 213017 did not follow standard instructions for "proper use," but rather folded back the flanges of the opposite end of the earplug before inserting it into their ears.

170.    Nor did Defendants' standard instructions for "proper use" inform users that the Dual-Ended Combat Arms Earplug would not provide a 22 NRR if they did not fold back the opposing flanges on the open end of the device before inserting the closed end of the device into their ears.

171.    Instead, Defendants' standard instructions simply directed users, such as Plaintiff, to insert the Dual-Ended Combat Arms Earplug into their ears.

172.    The instructions specifically stated: "INSERT the end you have selected into earcanal WHILE PULLING ear outward & upward with opposite hand. ADJUST until earplug feels securely seat in the earcanal."

173.    Thus, neither Plaintiff nor the United States military knew that users had to fold back the opposing flanges of the earplug in order to obtain a proper fit and seal.

174.    In fact, when asked whether he had "any documents showing that [he] told the Army that the instruction for the Combat Arms Version 2 should instruct [users] to roll back the flange," as in Test 213017, Mr. Berger of 3M testified "No."

175.    Julie Bushman, who previously served as 3M's Senior Vice President of Business Transformation and Information Technology, similarly stated at her October 20, 2015 deposition that "[t]here's nothing in [the] instructions for use that mentions rolling back the flange."

176.    Unlike Defendants' "single-sided" earplug, which is "sold in pillow packs w/instructions," Defendants internal documents confirm that the "Dual-Ended" version at issue here is "sold in bulk pack (no individual instructions)."

177.    Defendants knew that by failing to instruct Plaintiff to fold back the flanges of the open end of the Dual-Ended Combat Arms Earplug before inserting the closed end, the earplug would not seal to Plaintiff's ears, thereby allowing harmful noise to enter Plaintiff's ears unimpeded by the closed end of the earplug.

178.    Defendants also knew that by failing to instruct Plaintiff to fold back the flanges of the closed end of the Dual-Ended Combat Arms Earplug before inserting the open end, the earplug would not seal to Plaintiff's ears, thereby allowing harmful noise to enter Plaintiff's ears unimpeded by the open end of the earplug.

179.    And by failing to instruct Plaintiff to fold back the opposing flanges before inserting the closed end of the Dual-Ended Combat Arms Earplug into their ear, Defendants falsely overstated the amount of hearing protection supposedly provided by the closed end of the Dual-Ended Combat Arms Earplug.

180.    Mr. Berger confirmed at his deposition that the 22 NRR only applied to the closed end of the Dual-Ended Combat Arms Earplug if the user folded back the opposing flanges of the open end before inserting the closed end into the ear.

181.    When Defendants did not instruct users to fold back the flanges of the open end, Test 213015 revealed a 10.9 NRR for the closed end—less than half of the 22 NRR advertised on the label of the Dual-Ended Combat Arms Earplug.

182.    Mr. Berger also testified that Defendants "couldn't sell those plugs under the way they were being manufactured and fitted" because he and Mr. Kieper had terminated Test 213015, which Defendants had "intended to be a labeling test."

183.    In addition, by fabricating a 0 NRR for the open end of the Dual-Ended Combat Arms Earplug in the face of contradictory NRR data, Defendants intentionally misstated the amount of protection provided by that end of the device.

184.    Although the open end of the Dual-Ended Combat Arms Earplug provides little to no protection when used according to standard fitting procedures, Defendants represented to Plaintiff and the United States military that the open mode "allow[s] situational awareness yet protect[s] against dangerous peak levels with a filter element that reacts instantaneously to provide increased protection."

185.    Defendants' labeling, packaging, and marketing of the Dual-Ended Combat Arms Earplug are thus misleading and have caused thousands upon thousands—if not millions—of innocent users to suffer hearing loss and tinnitus.

186.    Still further, Defendants' testing, labeling, and marketing of the Dual-Ended Combat Arms Earplug violated EPA regulations, 40 CFR § 211.204-04 et seq., the Noise Control Act, 42 U.S.C. § 4901 et seq., and ANSI S3.19-1974.

187.    Given Defendants' improper and duplicitous testing, labeling, and marketing of the Dual-Ended Combat Arms Earplug, all known by Defendants prior to 2003, Mr. Berger of 3M declared at his October 8, 2015 deposition that "the instructions will be changed."

24

188.    Defendants discontinued the Dual-Ended Combat Arms Earplug on or about November 17, 2015, just a few weeks after Mr. Berger promised to change the instructions.

*Scientific Misrepresentations*

189.    In addition to sheltering the defects of the Dual-Ended Combat Arms Earplug, misrepresenting the NRR for both ends of the earplug, and failing to warn or provide proper instructions for using the earplug in civilian and military contexts, Defendants distorted scientific sources when marketing, advertising, and promoting the Dual-Ended Combat Arms Earplug to Plaintiff and the United States military.

190.    Citing the 1998 Blast Overpressure Study by Daniel Johnson, for example, Defendants' marketing brochures declared that "[t]he level-dependent technology used in the [Dual-Ended Combat Arms Earplug] has been tested on human subjects and found to be protective at 190 dBP for at least 100 exposures (sufficient to cover the loudest weapons in the military inventory, including shoulder-fired rockets)."

191.    Given Defendants' gloss on the Johnson study, customers believed that the Dual-Ended Combat Arms Earplug was "protective at 190 dBP for at least 100 exposures" of the "loudest weapons in the military inventory."

192.    Although Defendants repeatedly cited the Johnson study from 2003 to 2015 when marketing, advertising, and promoting the Dual-Ended Combat Arms Earplug, the Johnson study does not actually show that the Dual-Ended Combat Arms Earplug is "protective at 190 dBP for at least 100 exposures."

193.    To the contrary, according to a Technical Service Specialist at 3M, the Dual-Ended Combat Arms Earplug does "not reduce 190 dB explosions to a safe level."

25

194.    In a July 9, 2014 email, Ted Madison of 3M informed Mr. Berger and other 3M employees that the Johnson "study only looked at whether the soldiers experienced temporary threshold shifts (TTSs) after a few blasts. There is more and more evidence that damage to the ears can occur even when TTS does not occur."

195.    Mr. Berger echoed Mr. Madison's criticism in the same email chain, stating that the study "found for a limited number of blasts up to about 190 dB the plugs prevented temporary threshold shifts." However, "those were large weapons with much low[er] frequency content. For rifle shots that are more hazardous to the ear because of their high-frequency content, the protection will not be as great."

196.    Mr. Berger also said the Dual-Ended Combat Arms Earplug is "not the optimal choice for a gun range" and are "inadequate for indoor gun ranges," even though Defendants have advertised the Dual-Ended Combat Arms Earplug for use in indoor and outdoor gun ranges ever since they started selling the product.

197.    On February 9, 2010, moreover, Mr. Berger declared that "I know on past sheets we have claimed [that the Johnson study] found the plug protective for impulse noise up to 193 dBP," but there were "no tests allowed at 193" and "NOT ENOUGH SUBJECTS were exposed to provide a definitive answer."

198.    Mr. Berger concluded: "I am unconvinced that [the study can support the statement that says [the Dual-Ended Combat Arms Earplug] 'has been tested on human subjects and found to be protective at 190 dBP for at least 100 exposures.'" At best, Berger said, "it might be reasonable to claim 6 exposures."

199.    Even though Defendants knew the 1998 Johnson study did not support their claim that the Dual-Ended Combat Arms Earplug was "protective at 190 dBP for at least 100

26

exposures," Defendants continued to knowingly market, advertise, and promote the product to the public based on that false statement.

200.    Defendants did so despite acknowledging in their press releases that "[t]innitus, often referred to as 'ringing in the ears,' and noise-induced hearing loss can be caused by a one-time exposure to hazardous impulse noise, or by repeated exposure to excessive noise over an extended period of time."

### *Fraudulent Concealment*

201.    At all times material hereto, Defendants committed a continuing fraud in obfuscating and failing to disclose facts that were known to them relating to their fraudulent testing of the Dual-Ended Combat Arms Earplug and defective design of the product—facts that were not discovered and could not have been discovered by any person or Plaintiff undertaking reasonable due diligence.

202.    Plaintiff did not and could not have discovered with reasonable diligence the veritable facts regarding Defendants' misrepresentations, omissions, faulty testing, and the defective design of the Dual-Ended Combat Arms Earplug.

203.    Nor could Plaintiff have discovered that Defendants' Dual-Ended Combat Arms Earplug caused his hearing-related injuries and/or sequelae thereto because the earplug caused imperceptible loosening, as Defendants knew all along.

204.    Defendants are jointly and severally liable to Plaintiff for their individual and collective tortious acts.

### *Defendants' Attempt to Block a Competitor from Entering the Market*

205.    Besides fleecing civilians and the United States military into purchasing the dangerously defective Dual-Ended Combat Arms Earplug, Defendants also attempted to block competitors from entering the earplugs market.

206.    For example, one of Defendants' competitors is Moldex-Metric, Inc. ("Moldex")—a family-owned company located in Culver City, California.

207.    Among other safety devices, Moldex manufacturers a single-sided, non-linear, dual-mode earplug called BattlePlugs, which Moldex introduced to the market in approximately 2011.

208.    At the time, Defendants held a virtual monopoly in the market for non-linear earplugs.

209.    In order to prevent Moldex from selling BattlePlugs and competing in the earplugs market, 3M sued Moldex in the United States District Court for the District of Minnesota. *See 3M Company and 3M Innovative Properties Company v. Moldex-Metric, Inc.*, Case No. 12-611 (D. Minn.) ("*Moldex I*").

210.    The lawsuit accused Moldex of infringing U.S. Patent No. 6,070,693 ("693 patent"), which 3M and Defendants had purchased and/or licensed from ISL and ultimately used to design and develop the Dual-Ended Combat Arms Earplug.

211.    Upon notice of the lawsuit, Moldex immediately informed 3M and Defendants that BattlePlugs did not infringe the '693 patent under any legal theory.

212.    Undeterred, 3M stridently pursued its '693 patent claim against Moldex seeking injunctive relief intended to force Moldex out of the market.

213.     After Moldex moved for summary judgment on the '693 patent claim, however, 3M sent Moldex a covenant not to sue on both the '693 patent and Battleplugs in order to preclude the district court from adjudicating the motion.

214.     3M argued that the district court no longer had jurisdiction to hear their '693 patent claim or Moldex's dispositive motion of non-infringement.

215.     3M then moved to dismiss their infringement claims regarding the '693 patent with prejudice and to dismiss Moldex's counterclaims of noninfringement and invalidity of the '693 patent without prejudice.

216.     On June 19, 2013, the district court dismissed with prejudice 3M's claims against Moldex relating to the '693 patent.

217.     The district court also dismissed without prejudice Moldex's claim for a declaration that Battleplugs did not infringe the '693 patent.

218.     Although 3M ultimately abandoned their lawsuit, Moldex was forced to incur significant legal and other expenses in defending against 3M's baseless and malicious patent infringement claim.

219.     In June 2014, Moldex filed an antitrust sham litigation and malicious prosecution action against 3M, alleging that 3M's prosecution of the '693 patent claim in *Moldex I* was objectively baseless as no reasonable litigant could have expected to succeed on the merits of the claim. *See Moldex Metric, Inc. v. 3M Co. et al.*, Case No. 14-1821 (D. Minn.) ("*Moldex II*").

*220.*     Moldex also alleged that 3M filed the '693 patent claim for one reason and one reason alone: to drive Moldex out of the earplugs market. *Id.*

29

221.    The district court denied 3M's motion to dismiss Moldex's malicious prosecution claim on the ground that Moldex had shown "clear and convincing evidence" in support of its malicious prosecution claim. *Id.*, Dkt. No. 62.

222.    The district court then granted Moldex's motion for summary judgment on the objective baselessness of 3M Defendants' '693 patent claim, holding that "[n]o reasonable litigant could realistically expect success on the merits of 3M's claim that Moldex Metric infringed the '693 Patent." *Id.*, Dkt. No. 242.

223.    In addition to filing and prosecuting a baseless patent infringement lawsuit against Moldex, 3M used other predatory and nefarious conduct in attempting to force this family-owned company out of the earplugs market.

224.    For instance, 3M falsely maligned Moldex's Battleplugs in order to persuade the United States military to purchase the Dual-Ended Combat Arms Earplug through the JWOD (Javits-Wagner-O'Day) federal program.

225.    Moreover, in or around April or May 2012, shortly after 3M filed its frivolous '693 patent infringement claim against Moldex, 3M lodged a spurious protest against a solicitation that the United States military had awarded to Moldex.

### *3M & Defendants' Discontinuation of the Dual-Ended Combat Arms Earplug*

226.    Unable to push Moldex out of the earplugs market, Defendants discontinued the Dual-Ended Combat Arms Earplug on November 17, 2015.

227.    Although Defendants supplied the Dual-Ended Combat Arms Earplug to innocent civilians and military personnel for more than a decade, their discontinuation of this defective device had been a long time in the making.

228.    Defendants' internal testing in January 2000 revealed that the Dual-Ended Combat Arms Earplug was defectively designed and that the defective design caused the earplug to loosen imperceptibly in users' ears.

229.    Subsequent reports also made clear that "[a]lthough the Combat Arms Earplug (CAE) has been successful, there are a number of problems which need to be addressed which will result in changes and extensions to the line."

230.    Given the plethora of problems, Defendants changed the "two-ended design to a single-ended concept" and created different "sizing options" in 2005.

231.    In 2013, however, Defendants acknowledged that the list of all potential improvements to the Dual-Ended Combat Arms Earplug had "gone unanswered."

232.    In fact, more than 15 years after Defendants learned of the design defect of the Dual-Ended Combat Arms Earplug, Defendants finally discontinued this unreasonably dangerous product and "recommend[ed] that purchasers interested in [the product] consider 3M Combat Arms Earplugs – Generation 4 as an alternative."

233.    The Generation 4 Combat Arms Earplug, unlike the discontinued, dangerous, and defective Dual-Ended Combat Arms Earplug, provides linear and non-linear protection through a single-ended earplug rather than a dual-ended one.

234.    The single-ended Generation 4 Combat Arms Earplug thus does not suffer from the same dangerous defect as the Dual-Ended Combat Arms Earplug.

235.    The single-ended design of the Generation 4 Combat Arms Earplug is also easier for users to insert into their ear canal and obtain a proper fit and seal.

236.    Approximately one month before Defendants discontinued the Dual-Ended Combat Arms Earplug, Mr. Berger testified that the Generation 4 Combat Arms Earplug "did not

suffer from having a second set of flanges that interfered with grasping the plug well and being able to insert it properly."

237.    He also said that the Dual-Ended Combat Arms Earplug was "more difficult to fit because [users] don't have a stem or a rigid plastic part to hold onto."

238.    Because users do not have to "hold onto flanges, whether they're rolled back or not rolled back," Mr. Berger explained that the Generation 4 Combat Arms Earplug as well as other single-ended earplugs manufactured by Defendants, including the traditional Ultrafit earplug, had an ergonomically "better design."

239.    Indeed, none of Defendants' other pre-molded earplugs "have rearward facing flanges" like the defective Dual-Ended Combat Arms Earplug.

240.    Mr. Berger summarized some of these design defects in an internal email to 3M personnel, declaring that the Generation 4 Combat Arms Earplug is not only "easier to insert correctly for a good seal and consistent performance," but it is also "easier to operate since it does not require removal and reinsertion to change from the open/weapon's fire mode to the closed/constant protection mode."

241.    What's more, unlike the "one-size-fits-all approach" of the Dual-Ended Combat Arms Earplug that users "had to cram in" their ears, the Generation 4 Combat Arms Earplug comes in three different sizes—small, medium, and large.

242.    These different sizes allow users to obtain an effective seal, in contrast to the one-size-fits-all approach of the Dual-Ended Combat Arms Earplug.

243.    Defendants recognized in 2011—at least four years before they discontinued the Dual-Ended Combat Arms Earplug—that using a multiple sized earplug "raise[s] comfort levels substantially" and allows for an "effective seal."

244.    Other documents reveal Defendants' decades-old knowledge that "[m]ore exact sizing not only ensures user comfort, but also a better fitting earplug that would not lose its seal or fall out of the ear."

245.    Because the Generation 4 Combat Arms Earplug avoids these and other issues, it is safer and more effective than the Dual-Ended Combat Arms Earplug.

246.    Indeed, when testing the Generation 4 Combat Arms Earplug in its closed position per standard fitting procedures, Defendants measured a 23 NRR.

247.    The 23 NRR of the Generation 4 Combat Arms Earplug is more than double the 10.9 NRR of the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendants' standard procedures for "proper use."

248.    The 23 NRR of the Generation 4 Combat Arms Earplug is also higher than the 22 NRR of the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendants' reconfigured fitting procedures.

249.    Defendants thus concluded that the Generation 4 Combat Arms Earplug attenuates impulse and continuous noise better than the Dual-Ended Combat Arms Earplug.

250.    Even Defendants' "standard Ultrafit" earplug outperforms the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendants' standard fitting instructions or Defendants' reconfigured fitting tips.

251.    In a confidential document dated December 12, 2010, Mr. Berger emphasized the "unexpectedly low values of mean attenuation" for the closed end of the Dual-Ended Combat Arms Earplug compared to the "standard Ultrafit."

252.    Thus, the development of the Generation 4 Combat Arms Earplug brought Defendants "closer and closer (through CAE evolution) to the right solution," but they only

33

reached that solution after perpetrating a protracted fraud on thousands and perhaps millions of innocent civilians and military personnel.

253.    To make matters worse, this dangerously defective product has not been recalled and thus may continue to injure innocent civilians and military personnel.

### *Defendants' Settlement with the United States Government*

254.    On May 12, 2016, Moldex filed a sealed *qui tam* complaint against Defendant 3M under the False Claims Act, 31 U.S.C. § 3729 et seq.

255.    Moldex alleged, on behalf of the United States, that Defendant 3M sold the Dual-Ended Combat Arms Earplug to the "U.S. military for more than a decade without its knowledge of the defect."

256.    The United States intervened in the *qui tam* lawsuit on July 25, 2018, in order to hold Defendant 3M liable for its fraudulent conduct.

257.    One day later, Defendant 3M agreed to pay $9.1 million to resolve the allegations that it knowingly sold the Dual-Ended Combat Arms Earplug to the United States military without ever disclosing the design defects that hampered the effectiveness of this unreasonably dangerous hearing protection device.

258.    As one government official put it: "3M should have told the US Government about the slippage issues" with the Dual-Ended Combat Arms Earplug.

### *Plaintiff's Use of the Duel-Ended Combat Arms Earplugs and Injuries*

259.    Plaintiff joined the military on November 8, 2008 and was medically retired on March 8, 2021.

260.    Plaintiff received the Duel-Ended Combat Arms Earplugs in or about May 2008 prior to his deployment to Iraq while at Fort Campbell.

34

261.    Plaintiff wore the Duel-Ended Combat Arms Earplugs when exposed to loud noises until approximately October 2012.

262.    As a result of Plaintiff's use of the defective Duel-Ended Combat Arms Earplugs, Plaintiff suffered auditory injuries including hearing loss and tinnitus.

## CAUSES OF ACTION

### COUNT I
### DESIGN DEFECT - NEGLIGENCE

263.    Plaintiff restates the allegations above as if fully rewritten herein.

264.    At all times relevant to this action, Defendants had a duty to design, manufacture, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Dual-Ended Combat Arms Earplug with reasonable and due care for the safety and well-being of users, including Plaintiff and other civilians and military personnel who used the device.

265.    Plaintiff was a foreseeable user of the Dual-Ended Combat Arms Earplug.

266.    Defendants knew civilians and military personnel such as Plaintiff would use the Dual-Ended Combat Arms Earplug.

267.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

268.    When the Dual-Ended Combat Arms Earplug is inserted into the ear according to standard fitting instructions, a proper seal is not formed with the ear.

269.    The defect has the same effect for both ends of the device because the earplug is symmetrical. In either scenario, the earplug may not maintain a tight fit and seal in some users like Plaintiff, allowing dangerous sounds to bypass the earplug altogether and thus damage the user's hearing, unbeknownst to the user.

270.    Defendants failed to exercise reasonable and due care under the circumstances and therefore breached their duty of care in the following ways:

a.    Defendants failed to design the Dual-Ended Combat Arms Earplug in a manner that protected Plaintiff from injury;

b.    Defendants failed to design the Dual-Ended Combat Arms Earplug in a manner that provided linear and non-linear protection;

c.    Defendants failed to design the Dual-Ended Combat Arms Earplug in a manner that provided the amount of linear and non-linear protection as represented;

d.    Defendants misrepresented the NRRs of the Dual-Ended Combat Arms Earplug when used according to standard instructions;

e.    Defendants failed to test the Dual-Ended Combat Arms Earplug properly and thoroughly;

f.    Defendants failed to analyze the testing data of the Dual-Ended Combat Arms Earplug properly and thoroughly;

g.    Defendants claimed the Dual-Ended Combat Arms Earplug had benefits that it does not in fact have;

h.   Defendants designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug without adequately warning of the significant and dangerous risks of using the device;

i.   Defendants designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug without providing adequate or proper instructions to avoid foreseeable harm;

j.   Defendants designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug even though its risks and dangers outweighed any purported benefit of using the device;

k.   Defendants failed to fulfill the standard of care required of a reasonable and prudent manufacturer of hearing protection devices;

l.   Defendants continued to manufacture and distribute the Dual-Ended Combat Arms Earplug to civilians and the United States military after they knew or should have known of the device's adverse effects or the availability of safer designs;

m.   Defendants assumed the duty to warn of the defects and risks of the Dual-Ended Combat Arms Earplug by providing instructions and information related to its benefits and effectiveness, but Defendants failed to provide adequate warnings and instructions;

n.   Defendants provided inaccurate scientific and/or technical information when advertising, marketing, promoting, and supplying the Dual-Ended Combat Arms Earplug.

37

271.    Defendants knew or should have known that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous.

272.    The Dual-Ended Combat Arms Earplug was unreasonably dangerous when used by Plaintiff, who followed the instructions provided by Defendants and used the earplug with common knowledge of its characteristics and according to its common usage.

273.    At the time the Dual-Ended Combat Arms Earplug left Defendants' possession, the device was in a condition that made it unreasonably dangerous to Plaintiff.

274.    At the time Plaintiff used the Dual-Ended Combat Arms Earplug, the device was in a condition that made it unreasonably dangerous to Plaintiff.

275.    The Dual-Ended Combat Arms Earplug used by Plaintiff was expected to and did reach Plaintiff without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendants.

276.    At all relevant times, Plaintiff used the Dual-Ended Combat Arms Earplug in the manner in which the device was intended to be used.

277.    As designers, developers, manufacturers, inspectors, advertisers, distributors, and suppliers of the Dual-Ended Combat Arms Earplug, Defendants had superior knowledge of the product and owed a duty of care to Plaintiff.

278.    It was foreseeable that Defendants' misrepresentations, actions, and omissions would cause severe, permanent, and debilitating injuries to Plaintiff.

279.    Defendants' conduct was a substantial factor in bringing about the injuries and/or sequelae thereto sustained by Plaintiff because Defendants designed, manufactured, tested, sold, and distributed the Dual-Ended Combat Arms Earplug used by Plaintiff.

280.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered serious and dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

281.    As a direct and proximate result of Defendants' negligence, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

282.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT II
## DESIGN DEFECT – STRICT LIABILITY

283.    Plaintiff restates the allegations above as if fully rewritten herein.

284.    Defendants designed, manufactured, and sold the Dual-Ended Combat Arms Earplug.

285.    Plaintiff was a foreseeable user of the Dual-Ended Combat Arms Earplug.

286.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

287.    The Dual-Ended Combat Arms Earplug is also defective because it fails to contain adequate warnings of the significant risks of using the earplug, it fails to contain adequate

or proper instructions for use, and the risks and dangers of using the device outweigh any purported benefit.

288.    Defendants knew that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous to Plaintiff.

289.    The Dual-Ended Combat Arms Earplug is dangerous when used by ordinary users such as Plaintiff, who used the device as it was intended to be used.

290.    The Dual-Ended Combat Arms Earplug is dangerous to an extent beyond what would be contemplated by the ordinary user who purchased and/or used the device because it allows dangerous sounds to enter the user's ear canal.

291.    At all relevant times, an economically and technologically feasible and safer alternative design existed for the Dual-Ended Combat Arms Earplug.

292.    At the time the Dual-Ended Combat Arms Earplug left Defendants' possession, the Dual-Ended Combat Arms Earplug was defective and in a condition that made the device unreasonably dangerous.

293.    At the time Plaintiff used the Dual-Ended Combat Arms Earplug, the device was defective and in a condition that made it unreasonably dangerous.

294.    The Dual-Ended Combat Arms Earplug used by Plaintiff was expected to and did reach Plaintiff without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendants.

295.    At all relevant times, Plaintiff used the Dual-Ended Combat Arms Earplug in the manner in which the earplug device was intended to be used.

296.    The Dual-Ended Combat Arms Earplug was the proximate cause of Plaintiff's hearing loss and/or tinnitus because the design of the earplug allows dangerous sounds to bypass the earplug altogether, thereby posing a serious risk.

297.    Defendants' conduct was a substantial factor in bringing about Plaintiff's injuries and/or sequelae thereto because Defendants designed, tested, manufactured, sold, and distributed the Dual-Ended Combat Arms Earplug that caused those injuries and/or sequelae thereto.

298.    As a direct and proximate result of Defendants' defective design of the Dual-Ended Combat Arms Earplug, Plaintiff suffered serious and dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

299.    As a direct and proximate result of Defendants' defective design of the Dual-Ended Combat Arms Earplug, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

300.    Plaintiff may also be required to obtain additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT III
## FAILURE TO WARN – NEGLIGENCE

301.    Plaintiff restates the above allegations as if rewritten fully herein.

302.    At all times relevant to this action, Defendants had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise,

promote, distribute, and sell the Dual-Ended Combat Arms Earplug with reasonable and due care for the safety and well-being of Plaintiff, who were subject to and used the product.

303.    Plaintiff was a foreseeable user of the product.

304.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes the earplug is working as intended.

305.    Defendants breached their duty to Plaintiff by failing to warn of the risks and dangers of using the Dual-Ended Combat Arms Earplug as intended.

306.    The Dual-Ended Combat Arms Earplug did not warn or instruct that it allows harmful sounds to bypass the earplug, thereby posing a serious risk.

307.    Defendants also breached their duty to Plaintiff because they failed to warn or instruct that their testing subjects did not follow standard instructions, but rather used a reconfigured method of folding back the opposing flanges before inserting the device into their ears.

308.    Defendants also breached their duty to Plaintiff because they failed to warn or instruct that following Defendants' standard instructions for insertion would not achieve a 22 NRR and would thereby pose a serious risk to Plaintiff.

309.    Defendants further breached their duty to Plaintiff because they failed to warn or instruct that they had not adequately or properly tested the Dual-Ended Combat Arms Earplug.

310.    The warnings and instructions of the Dual-Ended Combat Arms Earplug did not provide the amount of information that an ordinary consumer would expect when using the device in a reasonably foreseeable manner.

311.    Had Plaintiff received proper or adequate warnings or instructions as to the risks of using the Dual-Ended Combat Arms Earplug, including but not limited to instructions directing them to fold back the opposing flanges of the device, Plaintiff would have heeded such a warning or instruction.

312.    Defendants' failure to warn of the design defect or risks and dangers of the Dual-Ended Combat Arms Earplug proximately caused Plaintiff's injuries and/or sequelae thereto.

313.    As a direct and proximate result of Defendants' failure to warn, Plaintiff suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

314.    As a direct and proximate result of Defendants' failure to warn, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

315.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**COUNT IV**
**FAILURE TO WARN – STRICT LIABILITY**

316.    Plaintiff restates the allegations above as if fully rewritten herein.

317.    Defendants designed, manufactured, and sold the Dual-Ended Combat Arms Earplug.

318.    Plaintiff was a foreseeable user of the Dual-Ended Combat Arms Earplug.

319.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

320.    The Dual-Ended Combat Arms Earplug is defective and unreasonably dangerous even if Defendants exercised all proper care in the preparation and sale of the product.

321.    Defendants knew that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous to users such as Plaintiff.

322.    The Dual-Ended Combat Arms Earplug is dangerous when used by an ordinary user who used the device as intended.

323.    The Dual-Ended Combat Arms Earplug is dangerous to an extent beyond which would be contemplated by the ordinary user who purchased and/or used the device because it allows dangerous sounds to enter the user's ear.

324.    Defendants knew or should have known of the defective design of the Dual-Ended Combat Arms Earplug at the time they provided the device to Plaintiff.

325.    At the time the Dual-Ended Combat Arms Earplug left Defendants' possession, the earplug was defective and in a condition that made it unreasonably dangerous.

326.    At the time Plaintiff used the Dual-Ended Combat Arms Earplug, the device was defective and in a condition that made it unreasonably dangerous to Plaintiff.

327.    The Dual-Ended Combat Arms Earplug used by Plaintiff was expected to and did reach Plaintiff without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendants.

328.    At all relevant times, Plaintiff used the Dual-Ended Combat Arms Earplug in the manner in which the device was intended to be used.

329.    The Dual-Ended Combat Arms Earplug is defective because Defendants failed to warn or instruct that the device allows dangerous sounds to bypass the earplug altogether, posing a serious risk to users.

330.    The Dual-Ended Combat Arms Earplug is also defective because Defendants failed to warn or instruct that their testing subjects did not follow standard instructions, but rather used a reconfigured method of folding back the opposing flanges before inserting the device into their ears.

331.    The Dual-Ended Combat Arms Earplug is also defective because Defendants failed to warn or instruct that following their standard instructions for insertion would not achieve a 22 NRR and would thus pose a serious risk to users.

332.    The Dual-Ended Combat Arms Earplug is also defective because Defendants failed to warn or instruct—or inadequately warned and instructed—that the device had not been adequately or properly tested.

333.    The warnings and instructions that accompanied the Dual-Ended Combat Arms Earplug failed to provide the level of information that an ordinary consumer, including Plaintiff, would expect when using the product in a manner reasonably foreseeable to Defendants.

334.    Had Plaintiff received proper or adequate warnings or instructions as to the risks of using the Dual-Ended Combat Arms Earplug, including but not limited to instructions to fold back the opposing flanges, Plaintiff would have heeded the warning and/or instruction.

335.    The Dual-Ended Combat Arms Earplug proximately caused Plaintiff's hearing loss and/or tinnitus because the device allows dangerous sounds to bypass the earplug altogether, thereby posing a serious risk to Plaintiff.

336.    Defendants' conduct was a substantial factor in causing Plaintiff's injuries and/or sequelae thereto because Defendants designed, tested, manufactured, sold, and distributed the Dual-Ended Combat Arms Earplug that caused the hearing loss and/or tinnitus.

337.    As a direct and proximate result of Defendants' failure to warn, Plaintiff suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

338.    As a direct and proximate result of Defendants' failure to warn, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

339.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT V
## NEGLIGENT MISREPRESENTATION

340.    Plaintiff restates the allegations above as if fully rewritten herein.

341.    Defendants had a duty to tell Plaintiff and the public the truth of the efficacy, risks, and harms associated with the Dual-Ended Combat Arms Earplug.

342.    Defendants breached their duty by falsely representing to Plaintiff and the public that the Dual-Ended Combat Arms Earplug had been properly tested and found to be effective

46

when Defendants knew or should have known that the device is defective, had not been properly or adequately tested, and that Defendants had manipulated the test results.

343.    Defendants also breached their duty by falsely representing to Plaintiff and the public that the instructions for use of the Dual-Ended Combat Arms Earplug were proper and adequate and would result in the advertised NRR when Defendants knew or should have known these statements were false.

344.    Defendants were in fact aware that they unlawfully manipulated the testing of the Dual-Ended Combat Arms Earplug and that their fitting instructions were inadequate and improper.

345.    Defendants failed to exercise ordinary care in the representation of the Dual-Ended Combat Arms Earplug during its manufacturing, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, in that Defendants negligently misrepresented the safety and efficacy of the device.

346.    As a result of these misrepresentations and omissions, Plaintiff suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

347.    As a direct and proximate result of these misrepresentations, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

348.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

47

## COUNT VI
## FRAUDULENT MISREPRESENTATION

349.    Plaintiff restates the allegations above as if fully rewritten herein.

350.    Defendants falsely and fraudulently represented to Plaintiff and the public that the Dual-Ended Combat Arms Earplug had been properly tested, was free from all defects, and contained adequate warnings and instructions.

351.    Defendants also falsely and fraudulently represented to Plaintiff and the public that the Dual-Ended Combat Arms Earplug functioned properly and promoted the closed end as having a 22 NRR and the open end having a 0 NRR.

352.    Defendants also manipulated testing of the Dual-Ended Combat Arms Earplug, resulting in false and misleading NRRs and improper fitting instructions.

353.    Defendants therefore knew that the Dual-Ended Combat Arms Earplug could and would injure Plaintiff.

354.    When Defendants made these representations, they knew their claims were false, and they willfully, wantonly, and recklessly disregarded the truth.

355.    Defendants made these false representations with the intent of defrauding Plaintiff and the public, and with the intent of inducing Plaintiff and the public to recommend, purchase, and/or use the Dual-Ended Combat Arms Earplug, all of which demonstrate a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff.

356.    At the time Defendants made the foregoing representations, and at the time Plaintiff used the Dual-Ended Combat Arms Earplug, Plaintiff did not know of the falsity of the representations and reasonably believed them to be true.

357.    In reliance upon these representations, Plaintiff was in fact induced to and did use the Dual-Ended Combat Arms Earplug, thereby sustaining injuries and/or sequelae thereto.

358.    As a result of the foregoing acts and omissions, Plaintiff suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

359.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

360.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT VII
## FRAUDULENT CONCEALMENT

361.    Plaintiff restates the allegations above as if fully rewritten herein.

362.    At all times relevant, Defendants misrepresented the safety and efficacy of the Dual-Ended Combat Arms Earplug for its intended use.

363.    Defendants knew or were reckless in not knowing that their representations were false.

364.    In their representations to Plaintiff, Defendants fraudulently concealed and intentionally omitted the following material information:

    a.    the flawed and deliberately manipulated testing of the Dual-Ended Combat Arms Earplug;

b.    the inadequate amount of hearing protection provided by the Dual-Ended Combat Arms Earplug;

c.    the inadequacy of the standard instructions for proper use of the Dual-Ended Combat Arms Earplug;

d.    the defective, improper, negligent, fraudulent, and dangerous design of the Dual-Ended Combat Arms Earplug; and

e.    the dangerous effects of the Dual-Ended Combat Arms Earplug.

365.    Defendants had a duty to disclose the foregoing issues to Plaintiff.

366.    Defendants had sole access to the material facts concerning the defective nature of the product and its propensity to cause dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

367.    Defendants' concealment of information regarding the safety and efficacy of the Dual-Ended Combat Arms Earplug was willful, wanton, and/or reckless and was intended to mislead Plaintiff into using the product.

368.    Defendants knew that Plaintiff could not determine the truth of this information.

369.    Plaintiff reasonably relied on facts revealed, which negligently, fraudulently, and/or purposefully did not include facts that Defendants concealed.

370.    As a direct and proximate result of the foregoing concealments and omissions, Plaintiff suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

371.    As a direct and proximate result of the foregoing concealments and omissions, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

372.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT VIII
## FRAUD AND DECEIT

373.    Plaintiff restates the allegations above as if fully rewritten herein.

374.    Defendants conducted unlawful and improper testing on the Dual-Ended Combat Arms Earplug.

375.    As a result of this unlawful and improper testing, Defendants blatantly and intentionally omitted certain test results and distributed false information that misrepresented the amount of hearing protection provided by the Dual-Ended Combat Arms Earplug.

376.    Defendants had a duty when disseminating information to disclose truthful information and a parallel duty not to deceive the public and Plaintiff.

377.    The information that Defendants distributed to Plaintiff contained false and misleading material representations and/or omissions concerning the safety and efficacy of the Dual-Ended Combat Arms Earplug.

378.    Upon information and belief, Defendants intentionally suppressed and/or manipulated test results to misrepresent the amount of hearing protection provided by the Dual-Ended Combat Arms Earplug.

379.    In making these misrepresentations, Defendants intended to deceive and defraud the public and Plaintiff, to gain the confidence of the public and Plaintiff, and to induce the public

and Plaintiff to purchase, request, dispense, recommend, and/or continue using the Dual-Ended Combat Arms Earplug.

380.    Defendants also made the foregoing false claims and false representations with the intent of convincing the public and Plaintiff that the Dual-Ended Combat Arms Earplug is effective and safe for use.

381.    These representations and the others alleged herein were false when made, and/or made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard for the truth.

382.    Defendants intended these false representations to deceive and defraud Plaintiff, to induce Plaintiff to rely upon them, and to cause Plaintiff to purchase, use, and/or rely on the Dual-Ended Combat Arms Earplug.

383.    Defendants recklessly and intentionally misrepresented the efficacy and safety of the Dual-Ended Combat Arms Earplug to the public and Plaintiff for the specific purpose of influencing the marketing of a product that only Defendants knew was dangerous and defective or not as safe as other alternatives.

384.    Defendants willfully and intentionally failed to disclose material facts regarding the dangers and safety concerns of the Dual-Ended Combat Arms Earplug by concealing and suppressing material facts regarding such information.

385.    Defendants willfully and intentionally failed to disclose material facts and made false representations in order to deceive and lull Plaintiff into purchasing, using, and/or relying on the Dual-Ended Combat Arms Earplug.

386.    Plaintiff did in fact rely on and believe Defendants' representations to be true at the time Defendants made the representations.

387.    Plaintiff was thus induced to purchase, use, or rely on the Dual-Ended Combat Arms Earplug based on Defendants' false representations.

388.    At the time Defendants made these representations, Plaintiff did not know about any safety concerns regarding the Dual-Ended Combat Arms Earplug.

389.    Plaintiff did not discover the true facts regarding Defendants' false representations; nor could Plaintiff have done so with reasonable diligence.

390.    Had Plaintiff known the true facts, they would not have purchased, used, and/or relied on the Dual-Ended Combat Arms Earplug.

391.    Defendants' conduct constitutes fraud and deceit and was committed and/or perpetrated willfully, wantonly, and/or purposefully on Plaintiff.

392.    As a result of the foregoing acts and omissions, Plaintiff suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

393.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

394.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT IX
## PUNITIVE DAMAGES

395.    Plaintiff restates the allegations above as if fully rewritten herein.

396.    Defendants have acted willfully, wantonly, with an evil motive, and recklessly in one or more of the following ways:

      a.    By failing to disclose material facts regarding the dangers and serious safety concerns of the Dual-Ended Combat Arms Earplug;

      b.    By concealing and suppressing material facts regarding the dangers and serious health and/or safety concerns of the Dual-Ended Combat Arms Earplug;

      c.    By failing to disclose the truth and making false representations with the purpose of deceiving and lulling Plaintiff into using and relying upon the Dual-Ended Combat Arms Earplug;

      d.    By falsely representing the qualities and characteristics of the Dual-Ended Combat Arms Earplug to the public and Plaintiff; and

      e.    By filing a baseless patent infringement lawsuit, misusing the JWOD program, and lodging frivolous protests to solicitation awards in order to block Moldex from selling BattlePlugs—a reasonable alternative design to the Dual-Ended Combat Earplug.

WHEREFORE, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

397.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that the Dual-Ended Combat Arms Earplug caused his injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

398.    Plaintiff did not suspect and had no reason to suspect that the Dual-Ended Combat Arms Earplug caused his injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

399.    In addition, Defendants' fraudulent concealment has tolled the running of any statute of limitations.

400.    Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the risks associated with the defects of the Dual-Ended Combat Arms Earplug and that the device caused their injuries and/or sequelae thereto.

401.    Through their ongoing affirmative misrepresentations and omissions, Defendants committed continual tortious and fraudulent acts.

402.    As a result of Defendants' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all claims in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

i.    That process issue according to law;

ii.    That Defendants be duly served and cited to appear and answer herein, and that after due proceedings are had, that there be judgment in favor of Plaintiff and against Defendants for the damages set forth below, along with court costs and pre-judgment and post-judgment interest at the legal rate;

iii.  Pain and suffering (past and future);

iv.  Wage loss (past and future);

v.  Loss of earnings and loss of earning capacity;

vi.  Medical expenses (past and future);

vii.  Loss of enjoyment of life (past and future);

viii.  Mental anguish and distress (past and future);

ix.  Disfigurement (past and future);

x.  Physical impairment (past and future);

xi.  Costs and expenses incurred in this litigation, including but not limited to expert fees and reasonable attorneys' fees;

xii.  Any and all applicable statutory and civil penalties, as allowed by law;

xiii.  Punitive or exemplary damages in such amounts as may be proven at trial;

xiv.  Pre- and post-judgment interest on any amounts awarded, as allowed by law; and

xv.  Any such other and further relief as the Court deems just and proper.


Dated: August 12, 2022                    */s/ Ashley C. Keller*

Ashley C. Keller (admitted *pro hac vice*)
ack@kellerpostman.com
Nicole C. Berg (admitted *pro hac vice*)
ncb@kellerpostman.com
Ashley Barriere (admitted *pro hac vice*)
ashley.barriere@kellerpostman.com
Frank G. Dylewski (admitted *pro hac vice*)
frank.dylewski@kellerpostman.com
Amanda Hunt (admitted *pro hac vice*)
amanda.hunt@kellerpostman.com
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606

Telephone: (312) 741-5220
Facsimile: (312) 971-3502

*Counsel for Nicholas Maciel*